RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0047p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

ARTEMIA STEWART,

               *Petitioner-Appellee,*

    *v.*

HUGH WOLFENBARGER,

               *Respondent-Appellant.*

No. 08-2154

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-10196—David M. Lawson, District Judge.

Argued: October 14, 2009

Decided and Filed: February 19, 2010

Before: GILMAN and GIBBONS, Circuit Judges; ANDERSON, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Debra M. Gagliardi, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. William J. Hubbard, THOMPSON HINE LLP, Cleveland, Ohio, for Appellee. **ON BRIEF:** Debra M. Gagliardi, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. William J. Hubbard, Frank R. DeSantis, THOMPSON HINE LLP, Cleveland, Ohio, for Appellee.

_____

**OPINION**

_____

    S. THOMAS ANDERSON, District Judge. Artemia Stewart was convicted of second-degree murder, armed robbery, and felony firearm. Stewart was sentenced to

_____

[*]The Honorable S. Thomas Anderson, United States District Judge for the Western District of Tennessee, sitting by designation.

1

concurrent terms of 39 to 60 years imprisonment on the murder and robbery convictions and two years on the firearm charge. After the Michigan appellate courts denied Stewart all post-conviction relief, Stewart filed a petition for federal habeas corpus relief. Holding that there was insufficient evidence to convict Stewart of second degree murder, the district court granted his petition. For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case with instructions to deny Stewart's petition for a writ of habeas corpus.

## I. BACKGROUND

### A.    Factual background

In the early hours of November 19, 1999, Robert Pippins was murdered at his home on Mansfield Street in Detroit, Michigan. Pippins's girlfriend, Crystal Robinson, discovered Pippins on the lawn in the backyard at his house, alive but laboring to breath. Pippins had suffered five gunshot wounds and later died at the hospital. Robinson testified that Pippins sold drugs out of his house and kept a .22 caliber rifle there.

Detroit Police Officer David Archambeau was responding to a call on St. Mary's Street when he heard gun shots coming from Mansfield Street on the night in question. Archambeau observed four black males running toward him. One of the men was wearing a long coat and appeared to be clutching a rifle or gun under the coat. When the four men escaped in a Plymouth Sundance, Archambeau and his partner pursued. The Sundance pulled into an alley where the four men jumped out of the car. The three passengers fled in one direction while the driver ran south from the vehicle.

The police's inventory search of the Sundance uncovered a loaded .22 caliber rifle with the stock cut off. Robinson, Pippins's girlfriend, subsequently testified at trial that she had observed a .22 rifle in Pippins's home and identified the rifle recovered from the Sundance as Pippins's rifle. Police also discovered in the vehicle thirty-six (36) ziplock bags of suspected crack cocaine, twenty-six (26) ziplock bags of suspected marijuana, money, and a photograph that appeared to be of the driver of the vehicle with his family. The car keys pictured in the ignition of the car in the photograph matched

the car keys that were in the ignition of the Sundance.  Archambeau identified the man in the photograph as Michael Hadley.  Police arrested Hadley and two other men, Deangelo Whitley and Deleon Tate, in connection with the murder of Robert Pippins.

At Stewart's trial, Investigator Gregory Edwards testified that Stewart was also a suspect in the Pippins murder.  However, police discovered that Stewart was no longer in Detroit but had gone to Alabama some time after the murder.  Stewart was eventually brought back to Michigan after being arrested on another criminal matter.   Upon Stewart's return to Michigan, police questioned Stewart about the Pippins murder and obtained a signed statement from him.  Stewart told police that Tate, Whitley, and Hadley were all involved in the Pippins murder.  Stewart indicated that Tate ("D"), who was Stewart's cousin, and Whitley ("Chubby Skoal") had told Stewart that they were going to commit a robbery and asked to borrow Stewart's .38 caliber pistol.  According to Stewart, he knew that "all they do is ride around and rob people."  Stewart gave Whitley his weapon.  Stewart also told police that "Little Mike" (i.e. Hadley) was with Tate and Whitley when they committed the robbery.  Stewart claimed that he did not know anything about the murder until the next day when Tate and Whitley told him that they had "hit a lick" [committed a robbery].  Whitley told Stewart that they had to throw his .38 away after they had "busted this nigger because the hooks [police] were chasing them."  Stewart identified a picture of Hadley and indicated that it was either Whitley or Hadley who had "smoked" Pippins.

According to Stewart, Whitley also told him that someone had stolen Whitley's car while Whitley was inside a gas station.   Whitley asked Stewart to lie and say that he was with Whitley and the others on the night of the Pippins murder.  Stewart told the police that he did not want to get involved and went to Alabama after police arrested Tate.

Dr. Leigh Hlavaty performed the autopsy on Pippins.  At trial she testified that Pippins suffered five gunshot wounds. Dr. Hlavaty recovered four projectiles from the body, of which three were from a large caliber weapon and one was from a small caliber

weapon.  Dr. Hlavaty testified that the wounds were the cause of death and that the manner of death was homicide.

Officer David Pauch testified about his examination of the semi-automatic rifle and .22 long rifle bullets.  He testified at trial that a cartridge case retrieved from the scene was fired from the .22 police recovered from the Sundance.  Pauch also examined three bullets, which he confirmed were fired from the same weapon, either a 9 mm or .38 caliber.  The weapon from which those bullets were fired was not available for his examination.  Officer Pauch further testified that a .22 bullet was a relatively small caliber bullet; whereas, a 9mm or .38 bullet was considered a large caliber.

**B.     Procedural history**

Stewart was indicted on four counts, including one count of felony murder, one count of armed robbery, and one count of felony firearm.  After a three-day trial in December 2001, a jury convicted Stewart of second degree murder, armed robbery, and felony firearm under an aiding and abetting theory.  Stewart filed a motion for a new trial, which the trial court denied.

Stewart timely appealed to the state court of appeals, raising several issues that included sufficiency of the evidence and erroneous jury instructions.  The Michigan Court of Appeals found that the evidence was sufficient to convict Stewart of second degree murder as an aider and abetter.  The Michigan Supreme Court denied Stewart's application for leave to appeal.

After exhausting his state remedies, Stewart sought a writ of habeas corpus in the United States District Court for the Eastern District of Michigan, raising many of the same arguments previously heard in his state court appeal.  The district court found no merit to any of Stewart's assignments of error except his insufficiency-of-the-evidence claim as to his second degree murder conviction.  As a result, the district court granted Stewart's petition as to that claim.  The district court subsequently denied the state's motion for reconsideration.  This timely appeal followed.

## II.  ANALYSIS

**A.     Standard of review**

This court reviews de novo a district court's decision to grant or deny a petition for a writ of habeas corpus.  *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006).  Both this Court and the district court are bound to apply the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) because Stewart filed his petition after AEDPA's effective date.  *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003).  Under AEDPA, a federal court may grant a writ of habeas corpus with respect to a "claim that was adjudicated on the merits in State court proceedings" if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  "A state court decision is contrary to clearly established federal law if the state court applies a rule that contradicts the governing law set forth in the Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from that precedent."  *Joseph,* 469 F.3d at 449-50 (brackets, citations, and internal quotation marks omitted).  On the other hand, a state court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing  legal  rule but applies it unreasonably to the facts of a particular prisoner's case," *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000), or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context."  *Joseph*, 469 F.3d at 450 (citation and internal quotation marks omitted).

A conviction is supported by sufficient evidence if, when "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th. Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)).  In a habeas proceeding, however, we simply cannot conduct a de novo review of the state court's application of that rule, but must review its

sufficiency-of-the-evidence decision under the highly deferential standard of AEDPA. *Id.* Stewart can be granted habeas relief only if the Michigan Court of Appeals unreasonably applied the *Jackson* standard. *Id.* Our task is to "determine whether it was objectively unreasonable for [the state court] to conclude that a rational trier of fact, after viewing the evidence in the light most favorable to the state, could have found that [Stewart] committed the essential element of [second degree murder] beyond a reasonable doubt." *See Nash v. Eberlin*, 258 F. App'x 761, 765 (6th Cir. 2007).

When reviewing whether the state court's determination was "objectively unreasonable," this court necessarily engages in a two-step analysis. First, we must ask whether the evidence itself was sufficient to convict under *Jackson*. The inquiry ends if the panel determines that there was sufficient evidence to convict Stewart. If we find that the evidence is insufficient to convict, we must then apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding that a rational trier of fact could find Stewart guilty beyond a reasonable doubt. The law therefore "commands deference at two levels." *Tucker*, 541 F.3d at 656.

**B.      The Elements of the Crime**

Stewart was convicted of second-degree murder under an aiding and abetting theory. The Supreme Court has stated that the *Jackson* "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324; *York v. Tate*, 858 F.2d 322 (6th Cir. 1988).

Under Michigan law, "Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense." Mich. Comp. Laws § 767.39. The Michigan Supreme Court has defined aiding and abetting as "all forms of assistance rendered to the perpetrator of a crime" and stated that the phrase "comprehends all words or deeds which may support, encourage or incite the commission of a crime." *People v. Palmer,* 220 N.W.2d 393, 396-97 (Mich. 1974). To

be found guilty as an aider and abettor, "the amount of advice, aid or encouragement is not material if it had the effect of inducing the commission of the crime." *Id.*

In order to sustain a conviction under an aiding and abetting theory, the prosecution had to show that "(1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement." *People v. Robinson,* 715 N.W.2d 44, 47-48 (Mich. 2006). Thus, "under Michigan law, a defendant who intends to aid, abet, counsel, or procure the commission of a crime, is liable for that crime as well as the natural and probable consequences of that crime." *Id.*

In this case Stewart can be guilty of second-degree murder only if he held the requisite intent to aid and abet that crime, if he had knowledge that the principal held the requisite intent for that crime at the time Stewart gave aid and encouragement, or if second-degree murder is a natural and probable consequence of the crime Stewart did aid and abet. The elements of second-degree murder under Michigan law are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. *People v. Goecke*, 579 N.W.2d 868, 878 (Mich. 1998). Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. *People v. Aaron*, 299 N.W.2d 304, 326 (Mich. 1980).

**C.     Summary of the Evidence**

The evidence in this case was largely circumstantial and consisted primarily of (1) Stewart's statement to the police; (2) the testimony of Crystal Robinson and the eyewitness testimony of Officer Archambeau; and (3) the police investigation tying Stewart's cohorts to the Pippins murder.

First, Stewart provided a signed statement to police detailing his knowledge of the Pippins murder. Specifically, Stewart told the police that Tate, Whitley, and Hadley were involved in the murder of Robert Pippins. Stewart admitted that he had provided a .38 handgun to Whitley, who together with Tate and Hadley were men whom Stewart knew to have robbed people in the past. In fact, Tate and Whitley told Stewart that they needed his gun for the very purpose of "hitting a lick" on the night of the Pippins murder. Stewart explained to police that "hitting a lick" meant committing robbery. Stewart thus gave his weapon to Whitley with the knowledge that they would use it to commit a robbery.

Although Stewart denied that he had knowledge of any plan to murder Pippins, Stewart did tell the police that Whitley did not return his handgun but had disposed of the weapon. Whitley explained to Stewart that they had "busted" someone with Stewart's gun, an expression which meant they had shot someone. The men went on to tell Stewart that they had fled from the police. Whitley asked Stewart to lie about being with them on the night before in an effort to establish an alibi. At that point, Stewart left the state and traveled to Alabama. Stewart stated that he subsequently learned that the three men had killed Pippins. Stewart told investigators that either Whitley or Hadley had killed Pippins and identified a picture of Hadley.

Based on this evidence and drawing all inferences in favor of the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that Stewart had provided a weapon which was used to rob and murder Robert Pippins.

Second, the jury received the testimony of Detroit Police Officer Archambeau. Officer Archambeau testified that he was at a location near Mansfield Street when the Pippins murder took place. Archambeau heard gunshots and then observed four black males running away from Mansfield Street. The four men escaped in a Plymouth Sundance and were pursued by Archambeau and his partner. When the Sundance pulled into an alley, Archambeau observed the four men jump out of the car and scatter in different directions. The subsequent inventory search of the vehicle uncovered a loaded .22 rifle with the stock cut off, which Pippins' girlfriend identified at trial as a weapon

belonging to Pippins. Robinson also testified that Pippins was a drug-dealer. In addition to the rifle, the vehicle contained thirty-six (36) ziplock bags of suspected crack cocaine, twenty-six (26) ziplock bags of suspected marijuana, money, and a photograph that appeared to be of the driver of the vehicle with his family. Police used the photograph to match the Sundance and the keys left in the ignition to the car and the car keys pictured in the photograph. Archambeau testified that the driver of the Sundance was the man in the photograph. That man was identified as Michael Hadley.

Based on this evidence and drawing all inferences in favor of the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that the men Archambeau observed running from Mansfield, entering the Sundance, and then later abandoning the vehicle were the men responsible for the robbery and murder of Robert Pippins. Furthermore, a rational trier of fact could have concluded beyond a reasonable doubt that four men were responsible for the crime, and not just the three named by Stewart, and that one of them was Michael Hadley, one of the same men Stewart implicated in the Pippins murder. However, the trier of fact could not have concluded beyond a reasonable doubt that Stewart was the fourth man at the scene.

Finally, the police investigation provided additional corroborating details about the Pippins murder and the weapons used in the crime. The autopsy showed that Pippins was shot five times and that the gunshots were the cause of death consistent with a homicide. Dr. Hlavaty testified that she recovered four bullets from the body, of which three were a large caliber and one was a small caliber. Officer Pauch added that a .22 bullet was a small caliber and that a 9mm or .38 bullet was considered a large caliber. Based on his examination and testing of the .22 rifle recovered from the Sundance, Pauch concluded that a cartridge case retrieved from the scene was fired from the same .22. Pauch also testified that three other bullets recovered from the scene were fired from the same weapon, either a 9 mm or .38. Because that weapon was not available, Pauch could not conclusively say whether it was a 9mm or a .38.

On the basis of this evidence and drawing all inferences favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that

Pippins was murdered and that the murderer fired at least one shot from Pippins' own .22.  A rational trier of fact could have also concluded beyond a reasonable doubt that three of the other wounds came from a large caliber gun, either a 9mm or .38.  There was no conclusive evidence that the large rounds came specifically from Stewart's .38 because the weapon was not found.  However, Stewart's statement to police corroborated that Stewart's .38 was used to murder Pippins.

**D.       Sufficiency of the Evidence to Convict Stewart as an Aider and Abetter**

As an initial matter, we acknowledge that Stewart's is an unusual case in two respects.  First, Stewart was convicted of second-degree murder for aiding and abetting the murder by providing one of the weapons the principals used to carry out the crime.  There was no evidence that Stewart was  present when the principals robbed and murdered Robert Pippins.   Indeed there was no evidence that Stewart knew that the principals intended to rob Pippins specifically or that a murder would be committed with Stewart's weapon.  Additionally, we note the fact that the jury actually acquitted Stewart of first-degree felony murder and convicted him of second-degree murder.  However, under Michigan law, both crimes required proof of largely the same elements including the same *mens rea*, malice, the difference being that the prosecution had to prove an underlying felony in order to convict of felony murder.   It would appear then that the jury found the elements of second-degree murder as well as an underlying felony and still acquitted Stewart of first-degree felony murder.

Although the facts of this case make it closer than other sufficiency-of-the-evidences cases, we hold that there was sufficient evidence from which a rational trier of fact could conclude that Stewart was guilty of second-degree murder under an aiding and abetting theory.  In assessing the proof, a court may sustain a conviction based upon nothing more than circumstantial evidence. *See United States v. Kelley,* 461 F.3d 817, 825 (6th Cir. 2006) ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.") Although the evidence in this case was largely circumstantial, there was sufficient evidence that Stewart aided and abetted the armed robbery and murder of Robert

Pippins. Stewart admitted that he provided a .38 handgun to Whitley with the knowledge that Whitley and Tate were going to use it to commit a robbery. A rational trier of fact could have found beyond a reasonable doubt that Pippins provided the .38; that Tate, Whitley, and Hadley used the .38 to rob Robert Pippins and then murder him; that these three men and one other were observed fleeing from the scene and were pursued by Detroit Police; that they abandoned their vehicle with the .22 rifle and the drugs stolen from Pippins; and that they later admitted to Stewart that they had used his gun to commit murder and disposed of the weapon during the police chase.

### 1.      *The Principals Committed the Pippins Murder*

Based on this evidence, we conclude that there was sufficient evidence to convict Stewart of second-degree murder as an aider and abetter. It is undisputed that there was sufficient evidence to establish the first two elements necessary to sustain a conviction under an aiding and abetting theory. First, there was sufficient evidence that the crime charged, the murder of Robert Pippins, was committed by Whitley, Tate, and Hadley. The evidence showed that Pippins was shot five times in a manner consistent with a homicide. Testimony was offered that Pippins was a drug-dealer and kept quantities of illegal narcotics in his home. Narcotics stored in individual ziplock bags along with money and Pippins' own firearm were recovered from a vehicle that sped from the vicinity of the crime scene. Officer Archambeau identified Hadley as the driver of that vehicle, and Stewart himself implicated Hadley and the two other principals in the murder of Robert Pippins in his sworn statement to the police. There was unrefuted testimony that Pippins was shot at least one time by the same firearm recovered from the vehicle driven by Hadley. There was, therefore, sufficient evidence from which a trier of fact could find that the principals Whitley, Tate, and Hadley were guilty of the murder of Robert Pippins.

### 2.      *Stewart Assisted the Commission of the Pippins Murder*

The second element to convict Stewart as an aider and abetter is also not in dispute.  Stewart performed acts or gave encouragement that assisted the commission of the crime, namely, the murder of Robert Pippins.  There was sufficient evidence that the Pippins murder was carried out by the men to whom Stewart had given a .38 handgun.  It is also undisputed that Stewart provided the weapon with the knowledge that the men intended to use it in the commission of a robbery.  Stewart himself informed the police that the same men later told him that they discarded the weapon after committing a murder, thereby admitting that it was his .38 which was used to murder Pippins.  The men also asked Stewart to lie in order to help them establish an alibi, which Stewart refused to do.  The autopsy confirmed that Pippins was shot at least three times by a large caliber weapon such as a .38.  Police found three bullet casings consistent with a .38 at the scene of the crime as well.  Therefore, there was sufficient evidence from which a rational trier of fact could find beyond a reasonable doubt that Stewart provided a weapon to the murderer and so performed acts that assisted the murder of Robert Pippins.

### 3.      *Stewart's Malice*

The primary issue in this appeal is whether Stewart held the requisite intent to be convicted of second-degree murder or had knowledge that the principals held such intent at the time that Stewart gave them aid and encouragement.  Because malice is the requisite *mens rea* for second-degree murder under Michigan law, *Goecke*, 579 N.W.2d at 878, the prosecution had to prove beyond a reasonable doubt that Stewart acted with malice or knew that the principals acted with malice at the time Stewart provided them with his firearm.

In the alternative, Stewart may also be found guilty as an aider and abetter under Michigan law if second-degree murder was a natural and probable consequence of the crime Stewart did aid and abet.  The *Robinson* court construed the language of Michigan's aiding and abetting statute to provide that an aider and abetter may be convicted of two types of offenses: the offense the aider intended to commit and any

offense which was the natural and probable consequence of the intended offense. *Robinson*, 715 N.W.2d at 49 ("we hold that when the Legislature abolished the distinction between principals and accessories, it intended for all offenders to be convicted of the intended offense, in this case aggravated assault, as well as the natural and probable consequences of that offense, in this case death."). Stewart does not dispute that he was guilty of aiding and abetting the crime of armed robbery. Therefore, even if there was insufficient evidence to show that Stewart acted with the requisite malice or that Stewart knew that the principals possessed the requisite malice for second-degree murder, a rational trier of fact could still convict Stewart of second-degree murder if that crime is a natural and probable consequence of armed robbery. Because we hold that there was sufficient evidence to infer Stewart's malice under the circumstances, we need not reach this alternative theory of Stewart's guilt.

Under Michigan law, "malice" is defined as "the intent to kill, the intent to inflict great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Goecke*, 579 N.W.2d at 878-79. An aider and abettor's state of mind may be inferred from all the facts and circumstances of the crime. *People v. Turner*, 540 N.W.2d 728, 734 (Mich. Ct. App. 1995), *overruled in part on other grounds*. Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime. *Id*. Also "malice is a permissible inference from the use of a deadly weapon." *People v. Martin*, 221 N.W.2d 336, 340-41 (Mich. 1974); *overruled in part on other grounds, People v. Woods*, 331 N.W. 2d 707 (Mich. 1982); *Brown v. Jackson*, 2009 WL 3125603, at *11-12 (E.D. Mich. Sept. 25, 2009); *McGuire v. Ludwick*, 2009 WL 2476452, at *3 (E.D. Mich. Aug. 11, 2009); *Daniels v. McKee*, 2009 WL 2351767, at *4 (W.D. Mich. July 29, 2009). *See also People v. Feldmann*, 449 N.W.2d 692, 697 (Mich. Ct. App. 1989); *Turner,* 540 N.W.2d at 733; *People v. Carines*, 597 N.W.2d 130, 136 (Mich. 1999); *People v. Mass,* 628 N.W.2d 540, 548 (2001).

In light of these principles of Michigan law, we hold that there was sufficient evidence presented in this case from which a rational trier of fact could infer the requisite malice to find Stewart guilty of second-degree murder. Initially, we emphasize that Michigan's definition of malice does not require that a defendant act with the intent to commit murder. Rather the standard is much broader and includes the intent to commit serious bodily injury or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death *or* great bodily harm. More specifically, "[t]he offense of second-degree murder 'does not require an actual intent to harm or kill, but only the intent to do an act that is in obvious disregard of life-endangering consequences.'" *People v. Aldrich*, 631 N.W.2d 67, 80 (Mich. Ct. App. 2001). Thus, it was not necessary to show that Stewart intended for Pippins or anyone else to be killed or that Stewart knew that Whitley intended to kill the victim of the robbery.

Stewart contends that the prosecution had to prove that murder was "the natural and probable consequence" of committing an armed robbery. According to Stewart, the state had to show that the men to whom Stewart gave the weapon had murdered or harmed their robbery victims during prior robberies in order to prove that murder was "the natural and probable consequence" of the armed robbery in this case. Because murder was not "the likely, probable, or intended outcome of this robbery," Stewart contends that he could not have acted with malice by lending his weapon to Whitley. Stewart cites national crime statistics for the proposition that very few armed robberies end in murder, and so it could not be said that murder is "the natural and probable" result of that type of crime. We reject Stewart's argument in light of the broad definition of malice adopted under Michigan law. Malice includes more than the intent to commit murder. For the same reasons, the statistics on the number of murders resulting from armed robberies cited by Stewart are largely irrelevant. One can possess malice as defined by Michigan law simply by acting with disregard for the "life-endangering consequences" of one's actions. *Aldrich*, 631 N.W.2d at 80.

Having established the applicable definition of malice, several of the relevant factors from which malice can be inferred are present in this case. First, by Stewart's own admission, he had a close association with at least one of the principals by virtue of the fact that Tate was his cousin. Stewart further told the police that he was acquainted with Whitley and Hadley and even knew that these men "rode around and robbed people." Clearly Stewart knew Whitley well enough to entrust his .38 to him. It could not be said then that the principals were strangers to Stewart. Second, although it is true that Stewart did not participate in the planning or execution of the crime, Stewart clearly knew that the men had carried out robberies in the past and intended to use his weapon in the commission of an armed robbery that very day. Despite his awareness of their past activities and present intentions, Stewart freely gave them aid. Indeed, Stewart armed them for the robbery. Third, Stewart's flight after the crime is not in dispute. Stewart was a suspect in the Pippins murder investigation, but before police could question him, Stewart fled to Alabama.

Perhaps most importantly, Stewart's act in providing a weapon to be used in an armed robbery was done with an "obvious disregard of the life-endangering consequences." It is undisputed that Stewart knew the weapon was going to be used to commit an armed robbery, a circumstance that would evidence "an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *See Goecke*, 579 N.W.2d at 878-79. Taken together these factors support an inference that Stewart acted with malice when he provided his .38 to the principals.

What is more, it was enough to infer Stewart's malice if the evidence showed that Stewart gave aid to the principals with the knowledge that they intended to do an act with "obvious disregard to its life-endangering consequences." The Michigan Supreme Court has held that in order to be convicted as an aider and abettor, the prosecution may prove either that "the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement." *Robinson,* 715 N.W.2d at 47-48. Consistent with this general principle

of aiding and abetting, Michigan law provides that "malice can be inferred from the aider and abettor's knowledge that his cohort possesses a weapon." *Hill v. Hofbauer*, 337 F.3d 706, 720 (6th Cir. 2003). This court and other federal courts applying Michigan law in habeas cases have recognized this inference concerning the aider and abetter's knowledge that the principal is armed. *See, e.g., Hill*, 337 F.3d at 720 (defendant aided and abetted second-degree murder by acting as lookout; case remanded on issue of aider's knowledge that principal was armed where trial court erred in admitting statement of co-defendant); *Brown*, 2009 WL 3125603, at *11-12 (defendant aided and abetted second-degree murder by planning robbery, coordinating movements with accomplice) ("the jury could infer from this careful planning that [the accomplice's] use of a gun was not an unforeseen circumstance"); *McGuire*, 2009 WL 2476452, at *3 (defendant aided and abetted felony murder, which also requires malice, by driving brother to a neighborhood and waiting in the car with knowledge that his brother had a weapon); *Daniels*, 2009 WL 2351767, at *4 (defendant aided and abetted felony murder by participating in robbery of drug house during which the principal threatened victims with firearm and then held victims at gunpoint). *See also People v. Turner,* 540 N.W.2d 728, 733 (Mich. Ct. App. 1995), *overruled in part on other grounds* ("Turner's knowledge that [his accomplice] was armed during the commission of the armed robbery is enough for a rational trier of fact to find that Turner, as an aider and abetter, participated in the crime. . . . [B]ecause Turner knew of [his accomplice's] intent to cause great bodily harm, a rational trier of fact could find that Turner was acting with 'wanton and willful disregard' sufficient to support a finding of malice."); *People v. Carines*, 597 N.W.2d 130, 137 (Mich. 1999) ("Defendant participated in a robbery involving the use of a knife, acting in wanton and willful disregard of the possibility that death or great bodily harm would result.").

In this case, the fact that Stewart aided the principals with the knowledge that they would be armed during the robbery offers another independent basis to infer Stewart's malice at the time he provided the firearm. The proof showed that Whitley and Tate came to Stewart and asked to use his firearm for the express purpose of committing an armed robbery. Whitley's stated intention to use Stewart's weapon to

commit an armed robbery evidenced "an obvious disregard of life-endangering consequences." In other words, Whitley, the principal to whom Stewart gave the weapon, possessed the requisite malice for second-degree murder at the time that Stewart gave him the weapon. For his part, Stewart knew that Whitley and the other principals intended to commit armed robbery and to use his firearm to accomplish the crime. Thus, Stewart was aware or should have been aware that Whitley was proceeding with "an obvious disregard of life-endangering consequences" of his actions. Therefore, there was sufficient evidence from which a rational juror could draw an inference that Stewart acted with malice by aiding and abetting Whitley.

The lower court in this case concluded that the malice inference did not apply because Stewart himself did not use the gun and there was no evidence that Stewart was even present at the scene of the robbery. Likewise, Stewart argues on appeal that the malice inference concerning knowledge of a cohort possessing a weapon cannot apply in his case, primarily because Stewart was not present at the scene of the crime. We find this distinction unconvincing. First, the Michigan case law is clear that the aider and abetter need not possess the weapon himself. Second, the Michigan Supreme Court has cited with approval an earlier version of Michigan's aiding and abetting statute which read, "all persons concerned in the commission of a felony, whether they directly commit the act constituting the offence, or aid and abet in its commission, *though not present*, may hereafter be indicted, tried and punished, as principals, as in the case of a misdemeanor" (emphasis added)). *Robinson*, 715 N.W.2d at 49 (citing Michigan's aiding and abetting statute, 1855 Public Acts 77, § 19). There is no indication that presence is required in order to be convicted as an aider and abettor.

Moreover, courts applying Michigan law have held that an inference of malice was appropriate under a variety of circumstances even when the aider and abetter is not in the principal's presence at the time the principal committed the murder. *See, e.g., Hill*, 337 F.3d at 720 (aider and abettor convicted of second degree murder for acting as lookout outside victim's home; remanded for error in admitting statement of co-defendant); *McGuire*, 2009 WL 2476452, at *3 (aider and abettor of felony murder

convicted for simply driving brother to a neighborhood and waiting in the car at a stop sign); *Daniels*, 2009 WL 2351767, at \*4 (aider and abettor of felony murder present in house but not in room when accomplice shot and killed robbery victim). These results are consistent with the broad applications of the inference approved by the Michigan courts. *Turner,* 540 N.W.2d at 733 ("Turner's knowledge that [his accomplice] was armed during the commission of the armed robbery is enough for a rational trier of fact to find that Turner, as an aider and abetter, participated in the crime with knowledge of [his accomplice's] intent to cause great bodily harm."); *Carines*, 597 N.W.2d at 137 ("Defendant participated in a robbery involving the use of a knife, acting in wanton and willful disregard of the possibility that death or great bodily harm would result.").

We recognize that the Michigan cases applying the malice inference all involve some degree of presence at the scene of the crime on the part of the aider and abetter. In this case, there was no evidence that Stewart was present at the scene of the crime or had any prior knowledge about whom the principals intended to rob. These facts should weigh against an inference of malice. However, they do not preclude the inference. Taken together with all of the evidence discussed above, we find that multiple factors give rise to an inference of Stewart's malice in this case. Stewart's association with the principals, Stewart's role in providing the weapon for the armed robbery, and Stewart's flight to Alabama immediately after the Pippins murder all support the inference of malice. Stewart's act of providing the weapon for an armed robbery evidences his own "obvious disregard of life-endangering consequences" of his actions, which is to say Stewart's malice. Furthermore, malice could be inferred in this case because of Stewart's knowledge that the principals would be armed during the robbery. Stewart gave aid with the knowledge of Whitely's "obvious disregard of life-endangering consequences." The fact that Stewart was not present and had no detailed knowledge of the robbery plot weakens the inference to be drawn from the fact that the principals were armed during the robbery. However, in light of the multiple bases for drawing the inference of malice, we hold that there was sufficient evidence presented from which a rational juror could infer Stewart's malice. Therefore, Stewart is not entitled to the relief sought in his habeas petition.

**E.     Fundamental Fairness Concerns**

In *Hill v. Hofbauer*, this court noted that courts applying Michigan's malice inference to aiders and abettors have also opined that "[i]t is fundamentally unfair and in violation of basic principles of individual criminal culpability to hold one felon liable for an unforeseen death that did not result from actions agreed upon by the participants." *Hill*, 337 F.3d at 720 (citing *Turner,* 540 N.W.2d at 733). In fact, the district court in this case cited this language in its decision without further comment or analysis. We recognize that on its face this oft-cited proposition appears to undermine the rationale for our holding in this case. More specifically, we affirm Stewart's murder conviction despite the fact that the murder of Robert Pippins was "an unforeseen death" that arguably "did not result from actions agreed upon by the participants." Therefore, we take this opportunity to clarify the application of the principle generally as well as its application to the facts of this case.

In order to provide greater context, we observe that the "fundamentally unfair" statement comes from an opinion of the Michigan Supreme Court, *People v. Aaron*, 299 N.W.2d 304, 327 (Mich. 1980). The significance of the *Aaron* decision lay in the fact that the Michigan high court held for the first time that a defendant could not be convicted of felony murder based solely on the intent to commit the underlying felony. *Id*. at 326. Rather, the prosecution had to prove malice in addition to the mental state required for the felony in order to convict the defendant of felony murder. *Id.* *Aaron* was notable then because it marked Michigan's abrogation of the common law felony-murder doctrine. *Id*. at 327. *See also* Paul Moreno, *People v. Aaron: Exorcising the Ghost of Felony Murder*, 88:3 Mich. Bar J., Mar. 2009.

In an effort to explain the reach of its holding, the *Aaron* court considered the effect of the abrogation of the felony-murder rule on the vicarious liability of co-felons where the underlying felony results in murder. *Aaron*, 299 N.W.2d at 327. In what is arguably dicta, the Michigan Supreme Court stated:

> In the past, the felony-murder rule has been employed where unforeseen
> or accidental deaths occur and where the state seeks to prove vicarious

liability of co-felons. In situations involving the vicarious liability of co-felons, the individual liability of each felon must be shown.  It is fundamentally unfair and in violation of basic principles of individual criminal culpability to hold one felon liable for the unforeseen and unagreed-to results of another felon.  In cases where the felons are acting intentionally or recklessly in pursuit of a common plan, the felony-murder rule is unnecessary because liability may be established on agency principles.

*Id.*  The *Aaron* court's reasoning logically flowed from the abrogation of the common law felony-murder rule in Michigan.  Just as the *Aaron* court held that the trier of fact could not infer intent to commit murder simply from the intent to commit the underlying felony, so too the trier of fact could not impute one co-felon's malicious intent to the other co-felon vicariously.  Thus, "[i]n situations involving the vicarious liability of co-felons, the individual liability of each felon must be shown." *Id.*

Courts applying Michigan law have subsequently cited *Aaron* many times for these propositions.  Upon examination of many of those decisions, we find that the *Aaron* court's "fundamentally unfair" concern has consistently been construed to mean that "[w]hen the state seeks to convict an aider and abettor of a substantive offense, the prosecution must establish that the aider and abettor himself possess[ed] the required intent or participate[d] while knowing that the principal possessed the required intent." *See West v. Jones*, 2006 WL 508652, at *6 (E.D. Mich. Feb. 28, 2006) (quoting *Turner*, 540 N.W.2d at 548) (internal quotation marks omitted); *see also Brown*, 2009 WL 3125603, at *11; *Woods v. Booker,* 2008 WL 4808724, at *10 (E.D. Mich. Oct. 23, 2008); *Stribling v. Smith*, 2000 WL 796181, at *18 (E.D. Mich. May 31, 2000); *Carines*, 597 N.W.2d at 136-37; *People v. Dumas*, 563 N.W.2d 31, 42 (Mich. 1997) (J. Boyle dissenting).  In fact, in a later opinion citing the "fundamentally unfair" language from *Aaron*, the Michigan Supreme Court stated, "This [fairness] concern is not implicated by an aiding and abetting standard which requires a finding that the co-felon acted with malice." *People v. Kelly*, 378 N.W.2d 365, 373 (Mich. 1985).

Based on this background, we hold that fairness concerns are not implicated in Stewart's case.  Our decision is consistent with the approach followed by the Michigan

courts, which require proof of the aider and abetter's malice, or knowledge that the principal possessed the required intent, over and above the intent required to prove the underlying felony. As set forth above, there was sufficient evidence from which a rational trier of fact could conclude that Stewart acted with malice when he gave his gun to Whitley for the purpose of committing an armed robbery. Therefore, fundamental fairness and "basic principles of individual criminal culpability" are satisfied in this case.

**F.     AEDPA Standards**

Even if we had concluded, after reviewing the record and drawing all conclusions in favor of the prosecution, that Stewart's convictions were not supported by sufficient evidence, the question would have remained whether it was unreasonable for the Michigan Court of Appeals to conclude that the evidence was sufficient. "A federal habeas court may not [grant habeas relief] simply because that court concludes in its independent judgment that the state-court decision applied a Supreme Court case incorrectly." *Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848 (2003). On the contrary, "it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 24-25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002). Stewart has failed to carry this burden. We find no basis to call the state court's decision an unreasonable application of *Jackson*. Under the circumstances, we cannot affirm the grant of Stewart's habeas petition because Stewart has failed to show that the decision of the Michigan Court of Appeals was objectively unreasonable.

For the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case with instructions to deny Stewart's petition for a writ of habeas corpus.