**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0327n.06

**No. 08-2297**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**May 28, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| MARLON BELL, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| ANDREW JACKSON, Warden, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Respondent-Appellee. | ) | |

Before: GUY, COLE and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. A jury convicted Marlon Bell of aiding and abetting felony murder, aiding and abetting armed robbery and conspiring to commit armed robbery. After pursuing his appeals in the state courts, Bell filed a federal petition for habeas corpus, claiming that (1) the trial court conducted a flawed *Batson* hearing; (2) the evidence did not support the convictions; (3) the trial court violated his Sixth Amendment right to present witnesses in his favor; and (4) the trial court gave misleading jury instructions.

I.

At some point, Marlon Bell, his cousin Matthew Bell and Troy King worked for an escort service, providing security for its female employees. By July 1999, all three men had left the business, but they remained in touch with the managers and female employees of it. On July 28,

King accompanied Chanel Roberts, a female employee, to collect approximately $4,000 in wages from the managers. King's cousin drove King and Roberts to Ann Arbor, where they used Roberts' cash to rent a car.

The next day, King and Matthew Bell stopped by Marlon Bell's house, which he shared with Darrell Deed and another cousin, Richard Bell. While at the house, King called Dobbs and told him that he needed the rental car to "hit a lick" and "pick the girls up." R.29-8, 138–140. ("Hit a lick," Deed later explained at trial, is slang for "rob someone." R.29-8, 139.) Marlon and Matthew Bell were present during the phone call, and the cousins talked with King while he waited for Dobbs to bring the car. Dobbs came for King, and the pair drove to a hotel, where they picked up Roberts. At some point King told Dobbs (out of Roberts' presence): "I'll rob her. I did it before." R. 29-9, 47.

Later that afternoon, King returned to the house with Roberts and Amanda Hodgson, another female escort. The escort service had paid Hodgson $1,200 that day. King and the two women joined Marlon Bell, his cousins and roommates on the porch, where the group listened to music and drank alcohol. At some point Matthew Bell brought Hodgson into the house, took her to the basement and fatally shot her.

Marlon Bell moved inside, accompanied by King, Deed and Roberts, and sat down at the dining room table. When Matthew Bell came upstairs from the basement, he shot and killed Roberts. No one, according to Deed, expressed surprise at the events unfolding in front of them.

Richard Bell and Deed immediately left the house. Together, Marlon and Matthew Bell took Roberts' body to the basement. Matthew then left the house with King. Marlon Bell was still at the house when Deed returned some time later. Marlon asked Deed if he wanted to see the bodies, which remained on the basement floor outside Marlon's bedroom. Deed declined the offer. Marlon then called his father and asked him to help dispose of the victims' bodies. The pair bound the bodies with electrical cords, wrapped them in sheets, placed them in a truck and dumped them in a park. The next morning, as Deed helped Marlon clean up the blood in the basement, Marlon told Deed that the women had been killed "for money." R. 29-8, 155–56.

Michigan tried Marlon Bell, Matthew Bell and Troy King at the same trial, each with his own jury. Marlon Bell's jury convicted him of two counts of aiding and abetting felony murder, two counts of aiding and abetting armed robbery and one count of conspiring to commit armed robbery. *People v. Bell*, 702 N.W.2d 128, 130–31 (Mich. 2005).

The Michigan Court of Appeals initially rejected each of Bell's relevant grounds for relief on the merits. *See People v. Bell*, No. 233234, 2003 Mich. App. Lexis 2458 (Mich. Ct. App. Oct. 2, 2003). Bell filed a motion for reconsideration, asking the court to take another look at his *Batson* claim, and the court granted the motion. Vacating its first opinion, the court held that the trial court failed to conduct a proper *Batson* inquiry, a failure that amounted to structural error requiring reversal of Bell's convictions. *People v. Bell*, 675 N.W.2d 894, 899, 901 (Mich. Ct. App. 2003). Bell's reconsideration motion did not raise, and the appellate court did not address, the other grounds for relief Bell initially pressed in his direct appeal.

The Michigan Supreme Court granted the State's petition for discretionary review of the *Batson* claim. Bell did not assert his other three challenges in a cross-appeal or argue them as alternative grounds for relief before the Michigan Supreme Court. The Michigan Supreme Court reversed and reinstated Bell's conviction. 702 N.W.2d 128, 142 (2005).

After the Michigan Supreme Court's decision, Bell asked the court of appeals to allow supplemental briefing so that he could pursue the claims that the court had once reviewed on the merits but that had been included in the opinion that it later vacated. The clerk's office at the court of appeals refused his filing, instructing Bell that because the Michigan Supreme Court had merely reversed, and not remanded, the case, the court could not consider his motion.

Bell filed a petition for habeas corpus in the district court, raising four grounds for relief. The court denied relief, rejecting his *Batson* challenge as meritless and his remaining three claims as procedurally defaulted and in the alternative without merit.

II.

Two matters deserve a preliminary word. First, before reaching the merits of Bell's claims, we typically would consider whether the unusual path Bell's claims traveled in the state courts before reaching ours raises an exhaustion or procedural-default problem. But because the merits of Bell's claims present a more straightforward route for resolving his petition, we need not consider the Warden's argument that Bell's claims are either unexhausted or procedurally defaulted. *See* 28 U.S.C. § 2254(b)(2) (courts may deny unexhausted habeas petitions on the merits); *Lambrix v.*

*Singletary*, 520 U.S. 518, 525 (1997) (courts may skip complicated "procedural-bar issues" if the merits are "easily resolvable against the habeas petitioner").

Second, we must consider whether the Antiterrorism and Effective Death Penalty Act requires us to defer to what the Michigan courts have said about each of Bell's claims. AEDPA allows us to second-guess a state court's adjudication of legal questions only insofar as it is "contrary to, or involves an unreasonable application of, clearly established" Supreme Court precedent. 28 U.S.C. § 2254(d). Questions of law that the state courts do not adjudicate on the merits, however, receive fresh review. 28 U.S.C. § 2254(d); *see Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003).

That dichotomy prompts this question: Did the state courts resolve any of Bell's claims on the merits? The answer is yes with respect to Bell's *Batson* claim, the merits of which the Michigan Supreme Court directly considered and rejected. *See Bell*, 702 N.W.2d at 142. The waters grow murkier with regard to Bell's other three claims. The state court of appeals initially rejected these claims on the merits, but it later vacated that decision when it granted reconsideration of Bell's *Batson* claim. Even though vacated opinions "be[come] nullities," *Jones v. O'Donnell*, 290 N.W. 375, 376 (Mich. 1940), the warden urges us to give AEDPA deference to the state appellate court's opinion. Yet the warden never closes the deal in explaining how an opinion that no longer has any legal effect could amount to an AEDPA-triggering "adjudication on the merits." We need not resolve the point today, however, because these three claims fail under either standard—whether given AEDPA deference or fresh review.

III.

We start with the *Batson* claim, which arises under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *See Batson v. Kentucky*, 476 U.S. 79, 84 (1986), *Rivera v. Illinois*, 556 U.S. ___, 129 S. Ct. 1446, 1453 (2009). The prototypical (and original) *Batson* claim arises when the prosecution improperly uses race in exercising peremptory challenges to potential jurors. But criminal defendants, like government prosecutors, may not discriminate on the basis of race either when using their peremptory challenges—what has come to be known as a reverse-*Batson* claim. *See Georgia v. McCollum*, 505 U.S. 42, 59 (1992). To determine whether a defendant is using his peremptory challenges in a racially discriminatory manner, trial courts typically follow the same three-step procedure used to root out prosecutors' discriminatory peremptory challenges. The court looks for "a prima facie case of racial discrimination by the defendant[]"; "the defendant[] must articulate a racially neutral explanation for peremptory challenges," *McCollum*, 505 U.S. at 59; and the trial court must "determine if the [state] has established purposeful discrimination," *Batson*, 476 U.S. at 98.

Michigan law allocates twelve peremptory challenges to defendants charged with crimes punishable by life imprisonment. Mich. Ct. R. 6.412(E). During jury selection, Bell, who is African-American, used six peremptory challenges to strike white jurors without objection from the prosecutor or comment by the court. When counsel attempted to strike a seventh white juror—Juror Number 10—the court refused to allow it. Calling the attorneys into chambers, the court told them that it was "going to disallow the defense attorney from exercising challenges, because the court has

determined, from the challenges for this jury for the better part of all day today, that the . . . defense attorney . . . is exercising challenges based on the race of the juror." R. 29-7, 94. Defense counsel asked for an opportunity to make a record, which the court refused. The court reconsidered, however, after which counsel said that "the number of white males on that panel still exceeds the number of minorities on that panel. Why don't you talk about the whole racial composition of the panel?" R. 29-7, 95. The court responded that what counsel said "actually supported [its] ruling. [Counsel] want[s] more racial members on the panel." R. 29-7, 95. The court seated Juror Number 10, and jury selection continued.

Bell's counsel later attempted to use a peremptory strike on Juror Number 5, and the State objected. The court re-questioned Juror Number 5 as to whether he would be fair to both sides. Juror 5 said that he would be. And the court disallowed the challenge. Counsel objected, saying that he did not "think [he] ha[d] to have a reason for exercising a peremptory challenge," R. 29-7, 110, but the court proceeded to seat Juror 5.

As a general matter, Bell acknowledges, the right to peremptory challenges by criminal defendants is a matter of legislative grace—not a right of "federal constitutional dimension," *United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000), and one that "may be withheld altogether without impairing the constitutional guarantee of an impartial jury and a fair trial," *McCollum*, 505 U.S. at 57. Still, he insists, the trial court acted so arbitrarily in disallowing his peremptory challenges and in failing to follow the three-step process—above all by refusing to allow him to

provide a race-neutral explanation for the challenged peremptory strikes—that it violated due process.

The Michigan Supreme Court held that the trial court cured any procedural error by permitting counsel to make a record of the race-neutral reasons for exercising these two challenges. *See Bell*, 702 N.W.2d at 136–37. Counsel then offered a race-conscious reason for wanting to strike Juror 10 ("the number of white jurors on the panel exceeds the number of minorities on that panel"), and he offered no reason for wanting to strike Juror 5 ("I think I don't have to have a reason for exercising a peremptory challenge."). R. 29-7, 95, 110. Because counsel failed to offer a race-neutral reason, the court reasoned, the trial court justifiably disallowed the peremptory challenges. *Bell*, 702 N.W.2d at 137.

In the alternative, the court held that, even if the trial court had not cured its error, Bell's conviction would stand. *Batson* errors, the court reasoned, are not structural errors requiring automatic reversal, but "nonconstitutional" errors to which harmless-error analysis applies. *Id.* at 138, 140–41, 143. Any error in the trial court's *Batson* inquiry, the court concluded, did not cause a "miscarriage of justice" and therefore did not warrant a new trial. *Id.* at 138, 143.

We need not concern ourselves with the Michigan Supreme Court's first conclusion (no error occurred) because its alternative holding (any error was harmless) is not contrary to, or an unreasonable application of, U.S. Supreme Court precedent. When the state court issued its decision, the U.S. Supreme Court had not decided whether *Batson* errors could be harmless, and

there thus was no "clearly established" U.S. Supreme Court precedent that the state court violated or otherwise unreasonably applied. *See* 28 U.S.C. § 2254(d).

Adding to Bell's troubles, the U.S. Supreme Court later *endorsed* the state court's decision that this kind of error could be harmless. *See Rivera v. Illinois*, 129 S. Ct. at 1452–53 (citing with approval *Bell*, 702 N.W.2d at 138–41). *Rivera* concluded that erroneously denying a defendant his peremptory challenges does not require automatic reversal under the federal constitution, and that state courts may permissibly find such errors harmless as a matter of state law. *Id.* at 1453, 1455. The Michigan Supreme Court did not violate federal law in doing just that.

Bell points out that *Rivera* leaves open the possibility that a *Batson* error might require reversal as a matter of due process if the "trial judge repeatedly or deliberately misapplie[s] the law or act[s] in an arbitrary or irrational manner." Reply Br. 7 (quoting *Rivera*, 129 S. Ct. at 1455). But aside from the brevity with which the trial court addressed his objections, Bell offers nothing to show that any error was more than "a good-faith, if arguably overzealous effort to enforce the antidiscrimination requirements of . . . *Batson*-related precedents"—precisely the type of error that does not violate due process. *Rivera*, 129 S. Ct. at 1455.

IV.

Bell argues that the evidence does not support his three convictions. Viewing the evidence "in the light most favorable to the prosecution," we must deny relief unless Bell shows that no

"rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Bell has not met this burden.

To obtain an aiding-and-abetting conviction under Michigan law, the State bore the burden of proving: (1) that the "the defendant or some other person" committed the charged crimes (here, felony murder and armed robbery); (2) that "the defendant performed acts or gave encouragement that assisted the commission of the crime[s];" and (3) that "the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement." *People v. Carines*, 597 N.W.2d 130, 135 (Mich. 1999). While "mere presence" at the scene of a crime does not suffice, even a defendant "silent throughout the commission of the crime" may be guilty of aiding and abetting if he "by his demeanor, or through behavior and acts not directly related to the crime, provide[d] 'moral support' that is recognizable to, and relied upon by, the principal." *Sanford v. Yukins*, 288 F.3d 855, 862 (6th Cir. 2002) (applying Michigan law). To obtain a conviction on the conspiracy charge, the State bore the burden of proving that Bell and at least one other person had the "intent to combine with others for an unlawful purpose"—here, armed robbery. *People v. Blume*, 505 N.W.2d 843, 846 (Mich. 1993).

Bell's basic argument with respect to all three convictions was that he was "merely present" at the scene of the crimes and therefore cannot be convicted of aiding and abetting them or conspiring to commit them. *See* Bell Br. 28. We disagree.

Bell was with King when King called Dobbs, asked for the rental car, noted that the girls "had the money" and explained his plan to "pick the girls up" and "hit a lick," namely rob them. R. 29-8, 139–40. A jury could reasonably conclude that a person planning on robbing someone does not customarily discuss his plan in the presence of an uninvolved outsider, least of all when the murder will happen at the residence of the ostensibly disinterested individual. *Cf. United States v. Batista-Polanco*, 927 F.2d 14, 18 (1st Cir. 1991).

Later, when Matthew Bell shot one of the victims "three or four feet" from Marlon Bell, R. 29-8, 149, Marlon did not react as an uninvolved bystander reasonably could be expected to react. He did not express shock at the crime, and eyewitness Deed did not remember Marlon (or anyone else for that matter) having *any* negative reaction to the sight of the killing. A defendant's "reactions to the circumstances" of a crime may suggest involvement (or for that matter lack of involvement) with a crime. *United States v. Salgado*, 250 F.3d 438, 447 (6th Cir. 2001) (conspiracy charge); *see also Stewart v. Wolfenbarger*, 595 F.3d 647, 657 (6th Cir. 2010) (aiding and abetting charge).

The sufficiency of the evidence to support this conviction, however, does not turn merely on Bell's presence during inculpating conversations, his reactions to two brutal crimes or the reality that the murders occurred at his house. It turns also on what Bell did next. After the murders, Bell took principal responsibility for disposing of the bodies, permitting the reasonable inference that he was a critical partner in the murders and robberies. It is the rare murder that does not contemplate removing and hiding the bodies. And Bell offers no theory of the evidence suggesting that any other participant in the crime spree was given this task. The only individual who took up the job was

Marlon Bell, who cleaned up after the murders and disposed of the bodies—calling his father, not one of the other defendants, to help him remove the bodies from the house and enlisting Deed to help clean up the lingering bloodstains. These actions, a jury could reasonably conclude, were a final step in an agreed-upon scheme to rob and murder the two women. The next day, to make matters worse, Bell explained to Deed that the purpose of the killings was to rob the victims, a disclosure that the jury could reasonably have classified as insider's knowledge. The evidence, construed as it must be in the light most favorable to the prosecution, supports Bell's three convictions.

V.

Bell next argues that the trial court improperly refused to allow his aunt, Jocarroll George, to testify that she saw Bell at a funeral around the time King had the "hit a lick" conversation at Bell's home. Under Michigan law, if defendants wish "to offer . . . testimony to establish an alibi at the time of the alleged offense," they must "file and serve upon the prosecuting attorney a notice in writing of his intention to claim that defense" "not less than 10 days before the trial." Mich. Comp. Laws § 768.20(1). And they have "a continuing duty to disclose promptly the names of additional witnesses which come to [their] attention . . . subsequent to [the] filing" of the alibi-witness notice. Mich Comp. Laws § 768.20(3). Before trial, Bell's counsel alerted the State that Bell intended to call an "unknow[n] number" of his relatives to testify that he attended a funeral the morning of the murders, proving that he was not present when the conspiracy to commit armed robbery was formed (during King's telephone call). R.1-2, 50. Counsel, however, never amended Bell's notice to name George. Accordingly, when counsel called George at trial and asked her to

explain where she was on the day of the crimes, the trial court excused George due to Bell's noncompliance with the alibi-notice statute.

Conceding that he failed to comply with the alibi-notice statute, Bell disclaims its relevance, arguing that George was not an alibi witness. We cannot agree. Under Michigan law, as under the law of most States, "[a]libi testimony is testimony which is offered in order to prove that the defendant was somewhere else than at the scene of the crime when the crime occurred." *People v. Gillman*, 239 N.W.2d 396, 398 (Mich. Ct. App. 1976). George, it is true, may not have testified about Bell's whereabouts at the time of the murders. But she would have testified about one aspect of the "scene of the crime"— that Bell was with her, not with his alleged co-conspirators, during one of the key moments that ties Bell to the conspiracy to commit armed robbery: when King said he needed the rental car to pick up the girls and "hit a lick." One can conspire to commit a murder or robbery without being at the scene of the murder or robbery (though Bell indeed was at the scene of both). Bell's state court filings prove as much. Captioned a "Notice of *Alibi* Defense," it contemplated that "relatives" attending the funeral with Bell would have supported "an *alibi* in defense of the conspiracy counts." R.1-2, 50 (emphases added). Whether we use Bell's own words in describing the defense or the nature of what George would have said about Bell's location at the time of one of the conspiracy-proving acts, the contention that George's testimony would have amounted to anything other than an alibi comes up short. *See People v. Watkins*, 221 N.W.2d 437, 440 (Mich Ct. App. 1974).

Because Bell cannot show that the trial court improperly interpreted this state law, his effort to claim a *federal* constitutional violation on the basis of this alleged misinterpretation of state law does not get off the ground. A criminal defendant's right to present evidence is not absolute. It may "bow to accommodate other legitimate interests in the criminal trial process." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (internal quotation marks omitted). In this instance, "[t]he State's interest in the orderly conduct of a criminal trial" "justif[ies] the imposition and enforcement of . . . rules relating to the identification and presentation of evidence." *Taylor v. Illinois*, 484 U.S. 400, 411 (1988). Bell does not offer any federal precedent to the contrary. No constitutional violation occurred.

## VI.

Bell argues that the jury instructions violated his due process rights because they did not adequately distinguish between the charged crime of aiding and abetting and the separate crime of being an accessory after the fact. We disagree.

The State, as an initial matter, did not charge Bell as an accessory after the fact. The most traditional reason for instructing the jury on a theory of conviction—that the instruction concerns a charged offense—thus does not exist.

Nonetheless, as Bell points out, he requested an accessory-after-the-fact-instruction for a different reason—to give the jury insight about this separate offense and to help the jurors understand that they could not convict Bell for aiding and abetting solely because he admitted to disposing of

the bodies. Apparently appreciating the point, the trial court attempted to explain the distinction

between the two crimes through the following instruction:

> Now, there is an offense known as Accessory After the Fact. And that simply means that a person has done an action, after a crime has been committed . . . to help the perpetrator escape detection. In other words . . . accessory after the fact has nothing to do with the offense itself. He comes in after an offense has been committed, and does something to cover up, or aid and abet the perpetrator to escape prosecution or to escape detection from committing the offense.
>
> Now, the law states that: "Any party who shall directly commit an offense, or who shall procure, counsel, aid and abet another person in commission of an offense, is as guilty as the party who commits the offense." That is known as Aiding and Abetting. . . . To convict a person as an aider and abetter, he must assist, encourage and aid and abet the other party in the commission of the offense.

R.29-11, 65–66.

These instructions, Bell argues, not only failed to have their intended effect, but, worse, they

created a "powerful likelihood that the jury would not understand that accessory after the fact is an

offense separate from the underlying robberies and murders." Bell Br. 51. He faults the trial court

for not explaining the elements of accessory after the fact, not giving the standard state law

instruction that explains the difference between accessory after the fact and aiding and abetting and

refusing to tell the jury to find Bell not guilty if they thought he was an accessory after the fact. At

bottom, however, these are objections to the state court's interpretation of state law, alleged errors

for which "federal habeas corpus relief does not lie." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

We cannot grant habeas relief merely because an instruction deviates from the standard state law jury

instructions or even if the instruction is "allegedly incorrect under state law." *Id.*, 502 U.S. at 71–72.

- 15 -

"The only question for us is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (quotation marks omitted). This one did not.

The court's instruction may not have been a paragon of clarity, but, when read in context, it conveyed the message Bell wanted the jury to understand: that accessory after the fact is different from aiding and abetting. The instruction says that, in contrast to being an aider and abetter, which requires one to "assist, encourage . . . the other party *in the commission of the offense*," R. 29-11, 65 (emphasis added), being an "accessory after the fact has *nothing to do* with the offense itself," R. 29-11, 65 (emphasis added). The court, to be sure, infelicitously used the phrase "aid and abet" in discussing what makes an accessory after the fact. But that was only to explain that being an after-the-fact accessory requires someone to do something that "aid[s] and abet[s] the perpetrator to escape prosecution or . . . detection"—in other words, to aid and abet *after* the principal commits the crime. R. 29-11, 65.

Any risk of confusion became more remote when the court used the following hypothetical to explain what it was saying:

> [For example, if] one person tells [a robber] what time the people who live [in the targeted house] will be out . . . but he doesn't go anywhere near there . . . he is as guilty as the person who actually went and broke into the house and took the things out. Under the law of aiding and abetting . . . *You have to participate. You have to assist. You have to aid and abet the other party in the commission of an offense.*

R. 29-11, 66–67 (emphasis added). This aspect of the instructions confirmed that aiding and abetting requires assisting someone "in the commission of an offense," not merely being called in after the crime to clean up the remains.

No doubt, in retrospect, the trial court might have delivered this message more clearly. But we cannot say that any lack of clarity in this state law jury instruction so "infected" the entire trial with unfairness as to violate due process. Placing the instruction in the context of the five-day trial and thirty pages of instructions points in the same direction. The court's instructions were one of many parts of the trial, which included "testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Bell's testimony, for example, would have helped the jury frame the distinction between accessory-after-the-fact and aiding-and-abetting liability. Throughout the trial, Bell's theory of the case was that, while he participated in the crime after the fact, he became involved only after the murders occurred. Bell testified in detail regarding the disposal of the bodies, *see, e.g.*, R. 29-10, 78–79, 89, and agreed that he was "just the clean-up person," R. 29-10, 92. After observing a trial where Bell constructed his entire defense around the idea that his involvement after the fact did not make him guilty of aiding and abetting felony murder and armed robbery, the jury had ample reasons to understand the difference between after-the-fact involvement and the offenses for which he was on trial.

The statements of Bell's counsel lead to the same conclusion. *See Cupp*, 414 U.S. at 147 (counsel's statements relevant to whether an erroneous jury instruction "infected" the trial). Counsel

urged during his opening statement that Bell was "no more than [an] accessory after the fact," R. 29-7, 133, spent significant time during closing argument insisting that Bell's only involvement was "after the fact," R. 29-11, 39, and explained that "under our law" he was "an accessory after the fact . . . not before the fact," R. 29-11, 44. While the trial court admonished the jury that counsel's opening and closing remarks were neither evidence nor statements of law, counsel's statements gave the jury context in which to understand the court's accessory-after-the-fact instruction. *See United States ex rel. Huckstead v. Greer*, 737 F.2d 673, 677 (7th Cir. 1984). In the final analysis, Bell complains not about an inaccurate state law jury instruction but about one that was imprecise. In the context of this trial—the evidence introduced, the arguments of counsel, the other instructions offered by the court—the risk of confusion was not as great as Bell suggests, and at all events it does not suffice to obtain *federal* habeas relief given that any imprecision did not infect the entire trial with unfairness.

## VII.

For these reasons, we affirm the district court's denial of the writ.