**IVAN CHINNERY, Appellant/Defendant**

**v.**

**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Crim. No. 2009-0037

Supreme Court of the Virgin Islands

May 27, 2011

509

MICHAEL C. QUINN, ESQ., REBECCA E. WEISS, ESQ., Dudley, Topper, and Feuerzeig, LLP, St. Thomas, USVI, *Attorneys for Appellant.*

MATTHEW C. PHELAN, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.* CABRET, *Justice, concurring in part, dissenting in part.*

## OPINION OF THE COURT

(May 27, 2011)

HODGE, C.J. Appellant Ivan Chinnery challenges his convictions for two counts of unlawful sexual contact in the first degree on the grounds that (1) the Superior Court erred in upholding a challenge to his attempted peremptory strike of a prospective white juror; (2) the Superior Court erred in admitting evidence of prior bad acts; and (3) the interests of justice require a new trial. For the reasons that follow we will reverse the Superior Court's May 7, 2009 Judgment and Commitment and remand the matter to the Superior Court for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On March 3, 2008, the People of the Virgin Islands charged Chinnery with two counts of unlawful sexual contact in the first degree in violation

of 14 V.I.C. § 1708(1). According to the April 21, 2008 Amended Information, Chinnery had allegedly grabbed the breasts and buttocks of A.S., a thirteen-year old minor, on the island of St. John on January 16, 2008.

The Superior Court conducted jury selection for Chinnery's trial on February 13, 2009. During jury selection, Chinnery attempted to exercise two peremptory strikes to exclude prospective Jurors No. 3 and No. 4 — both of whom appeared white — from the panel. However, after the People challenged Chinnery's peremptory strikes pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L.Ed.2d 69 (1986), the Superior Court allowed Chinnery to strike only one of the prospective jurors. Chinnery's counsel chose to strike prospective Juror No. 4, but prospective Juror No. 3 became a member of the jury.

Chinnery's trial began on February 17, 2009. At trial, A.S. testified that on the morning of January 16, 2008, Chinnery had approached her and her nine-year old sister, Y.S., from behind and put his arms over their shoulders. (J.A. at 176.) According to A.S., both she and Y.S. had removed Chinnery's arms and kept walking, but Chinnery then grabbed A.S.'s buttocks with one hand and squeezed her breast with his other hand. (J.A. at 176-77.) A.S. further testified that Chinnery continued to touch her in these places even as she tried to push him away, and did not stop until a woman, later identified as Kim Parsil, "helped [her] out." (J.A. at 176-77.) Y.S., who also testified, corroborated A.S.'s statement that Chinnery had touched A.S.'s buttocks, but did not say that she had seen Chinnery touch A.S.'s breast. (J.A. at 264.) Similarly, Parsil testified that she had seen Chinnery grab the girls and try to feel the girls' chests. (J.A. at 342-43; 351.)

Because the Superior Court had, prior to trial, granted the People's motion to admit Chinnery's prior bad acts, A.S. and Y.S. were also permitted to testify about Chinnery's previous visits to their residence. For instance, A.S. testified that, between January and May 2007, Chinnery had asked her if she was a virgin and told her that she had a "nice ass." (J.A. at. 184-85.) Similarly, the mother of A.S. and Y.S., testified that Chinnery was always asking her how A.S. was doing in school, whether A.S. was a virgin, and told her that he was going to marry A.S. (J.A. at 315.) In his defense, Chinnery called Detective Kent Hodge, Sr., who testified that a videotape that may have depicted the incident had been erased, (J.A. at 365), as well as Sarah M. Smith and Cori Christian,

both of whom testified that they had only seen Chinnery put his hands on the girls' shoulders and ask them how they were doing at school. (J.A. at 373-74, 387-88.)

On February 18, 2009, the jury found Chinnery guilty on both counts. The Superior Court orally sentenced Chinnery on April 14, 2009, to fifteen years incarceration, with credit for time served. Chinnery timely filed his notice of appeal on April 24, 2009.[1] Subsequently, the Superior Court memorialized its oral sentence in a May 7, 2009 written Judgment and Commitment.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." V.I. CODE ANN. tit. 4 § 32(a). Since the Superior Court's May 7, 2009 Judgment and Commitment is a final judgment, this Court possesses jurisdiction over Chinnery's appeal.

Ordinarily, the standard of review for this Court's examination of the Superior Court's application of law is plenary, while the trial court's findings of fact are reviewed for clear error. *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007). However, the Superior Court's evidentiary decisions are reviewed only for abuse of discretion. *Blyden v. People*, 53 V.I. 637, 656-57 (V.I. 2010), *aff'd*, No. 10-3656, 437 Fed. Appx. 127, 2011 U.S. App. LEXIS 7969 (3d Cir. Apr. 19, 2011). Nevertheless, when a criminal defendant fails to object to a Superior Court decision or order, this Court only reviews for plain error, provided that the challenge has been forfeited rather than waived. *Francis v. People*, 52 V.I. 381, 390-91 & n.5 (V.I. 2009).

### B. The Superior Court's Application of *Batson*

Chinnery, as his primary issue on appeal, argues that the Superior Court erred when it upheld the People's *Batson* challenge because it failed to conduct the proper inquiry mandated by *Batson*. However, the

---

[1] *See* V.I.S.CT.R. 5(b)(1) ("A notice of appeal filed after the announcement of a decision, sentence, or order — but before entry of the judgment or order — is treated as filed on the date of and after the entry of judgment.")

People contend that (1) Chinnery failed to preserve the *Batson* issue for appeal; (2) that even if preserved, the Superior Court did not misapply *Batson*; and (3) even if the Superior Court erred in its *Batson* analysis, the error was harmless. We disagree.

### 1. *Chinnery Preserved the Batson Issue for Appeal*

In its appellate brief, the People contend that this Court may not review the *Batson* issue because Chinnery waived any objection to the seating of prospective Juror No. 3 because (1) "the defense failed to question, argue or object to the [Superior] Court's ruling;" (2) "the defendant has supplied no record of the particular racial, ethnic, or gender composition of the venire panel, the jury pool after the 'for cause' strikes or the final jury," and "[t]o preserve this matter for appeal, [Chinnery] could have described the national origin, the gender and the racial composition of the venire;" and (3) "[t]he defense never attempted to strike for cause *any* juror but then have that request be denied by the Superior Court." (Appellee's Br. at 13-15) (emphasis in original).) Accordingly, as a threshold matter, this Court must determine whether Chinnery's *Batson* argument has been preserved, forfeited, or waived.

■■ Here, Chinnery clearly fully preserved his *Batson* argument for appeal. Although the People contend that Chinnery failed to object to the Superior Court's ruling, the jury selection transcript clearly indicates that Chinnery wished to use his peremptory challenges to strike both prospective Jurors No. 3 and No. 4, that the People challenged the strikes under *Batson*, and Chinnery attempted to argue that his reason for striking both prospective jurors was race neutral, yet was told by the Superior Court that he could only strike one juror rather than both. (J.A. at 111-13.) Moreover, it appears from the record that Chinnery's counsel may have tried to clarify the legal standard for a *Batson* challenge when he started to tell the trial judge "[t]he People don't give you information either on the charge, when they come up, you have to go through — " and was then interpreted by the judge. (J.A. at 112.) Significantly, when Chinnery's counsel chose to strike prospective Juror No. 4, he expressly stated that he will allow prospective Juror No. 3 to sit on the jury only "[i]f I have to leave one in." (J.A. at 113.) *See United States v. Paul*, 542 F.3d 596, 599 (7th Cir. 2008) ("Once a court has conclusively ruled on a matter, it is unnecessary for counsel to repeat his objection in order to preserve it for appeal. . . ."); *United States v. Brownlee*, 454 F.3d 131, 140 n.6 (3d Cir.

2006) ("After the Court ruled that certain of the proffered testimony would not be allowed, defense counsel was not obligated to lodge a post-ruling objection to preserve the issue for appeal.") (citing FED. R. CRIM. P. 51(b)); *see also* FED. R. CRIM. P. 51(a) ("Exceptions to rulings or orders of the court are unnecessary."). Under these circumstances, Chinnery clearly did not consent to seating prospective Juror No. 3 in exchange for striking prospective Juror No. 4 or otherwise waived objection or manifest acceptance of the Superior Court's decision.

■■ With respect to the People's claim that Chinnery's failure to develop a record of the racial, ethnic, and gender composition of the entire venire panel resulted in waiver of the *Batson* issue, we find that the People's argument lacks merit. "Throughout the *Batson* inquiry, the ultimate burden of persuasion always rests with the party challenging the strike." *United States v. Jackson*, 347 F.3d 598, 604 (6th Cir. 2003). Therefore, "a party 'who requests a *prima facie* finding of purposeful discrimination is obligated to develop a record . . . .'" *Holder v. State*, 354 Ark. 364, 124 S.W.3d 439, 451 (2003) (quoting *United States v. Wolk*, 337 F.3d 997, 1007 (8th Cir. 2003)). In this case, it was the People who challenged Chinnery's use of his peremptory strikes on prospective Jurors No. 3 and No. 4 pursuant to *Batson*. Accordingly, the People — and not Chinnery — possessed the burden of proof and, consequently, were required to create a sufficient record in the Superior Court.[2]

■ Likewise, we find that the People's final argument in support of waiver — that Chinnery did not preserve the *Batson* issue because he made no attempt to strike prospective Juror No. 3 for cause — also lacks merit. In addition to not citing any authority for the proposition that the denial of a peremptory strike of a prospective juror cannot be reviewed on appeal unless a for cause challenge to that prospective juror is made, the People concede in its brief that "there would be no basis to strike either [Jurors] No. 3 or No. 4 for cause since they both met the requirements of jury service and no bias had been shown." (Appellee's Br. at 15.) Under these circumstances, requiring Chinnery to frivolously challenge either

---

[2] Moreover, we note that the United States Court of Appeals for the Third Circuit has expressly held that the information the People claim should have been put on the record in the Superior Court — statistical information about the gender, racial, and ethnic composition of the venire panel and the jury that was ultimately selected — is not required to preserve a *Batson* challenge for appeal, even though it may be helpful. *See Holloway v. Horn*, 355 F.3d 707, 728 (3d Cir. 2004).

prospective juror for cause for the sole purpose of preserving the *Batson* issue for appeal — when the *Batson* challenge had been initiated by the People and was sustained by the Superior Court without Chinnery's consent — would have served no legitimate purpose except to unnecessarily waste additional judicial resources. *See Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004) (explaining that the purpose of requiring objections is to conserve judicial resources by "promot[ing] the prevention and correction of errors."). Consequently, we find that Chinnery neither waived nor forfeited the correct application of *Batson*, but fully preserved the issue for appeal.

### 2. *The Superior Court Erred in its Batson Analysis*

■ "We evaluate a claim under *Batson* using a three-step process: (1) has the objector established a *prima facie* case of purposeful discrimination in the exercise of peremptory challenges against jurors of, for example, a particular race?; (2) if yes, did the party defending the challenges rebut the *prima facie* case by tendering a race-neutral explanation for the strikes?; (3) if so, has the objector carried his or her burden of proving purposeful discrimination, such as showing that the proffered explanation is pretextual." *Rico v. Leftridge-Byrd*, 340 F.3d 178, 184-85 (3d Cir. 2003) (citing *United States v. Milan*, 304 F.3d 273, 281 (3d Cir. 2002)). We conclude, for the reasons that follow, that the Superior Court failed to follow any of these steps.

■ "[T]he establishment of a prima facie case is an absolute precondition to further inquiry into the motivation behind the challenged strike." *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1038 (11th Cir. 2005) (quotation marks and citation omitted). Moreover, it is well established that "numbers alone," while relevant, cannot, by themselves, establish a *prima facie* case of purposeful discrimination under step one of the *Batson* inquiry. *See Moran v. Clarke*, 443 F.3d 646, 652 (8th Cir. 2006); *Ochoa-Vasquez*, 428 F.3d at 1044 (holding that court must consider "all relevant circumstances," not just mere fact that stricken jurors are of a particular race); *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 562 (5th Cir. 2001) ("At the time of the *Batson* objection, Foot Locker objected only on the basis that Brown used his four peremptories on white jurors. Standing alone, these numbers do not make a prima facie case."); *United States v. Bergodere*, 40 F.3d 512, 516 (1st Cir. 1994) ("A defendant who advances a *Batson* argument ordinarily should 'come forward with

facts, not just numbers alone.' . . . . Here, the defendant provided nothing in the way of either direct or circumstantial proof to buttress the naked statistic on which he relies.") (quoting *United States v. Moore*, 895 F.2d 484, 485 (8th Cir. 1990)); *United States v. Clemons*, 843 F.2d 741, 746 (3d Cir.) *cert. denied*, 488 U.S. 835, 109 S. Ct. 97, 102 L. Ed. 2d 73 (1988). ("Accordingly, we find that establishing some magic number or percentage to trigger a *Batson* inquiry would short-circuit the fact-specific determination expressly reserved for trial judges."). Instead, a trial judge should consider "five factors that are relevant to a prima facie case: (1) the number of racial group members in the panel, (2) the nature of the crime, (3) the race of the defendant and the victim, (4) a pattern of strikes against racial group members, and (5) the [attorney's] questions and statements during the voir dire." *Simmons v. Beyer*, 44 F.3d 1160, 1167 (3d Cir. 1995) (citing *Clemons*, 843 F.2d at 748). These factors, however, do not bar trial judges from considering other factors as well, for *Batson* requires a trial judge to consider "all relevant circumstances." *Clemons*, 843 F.2d at 748.

 In this case, there is no indication that the Superior Court made any attempt to determine whether the People had established a *prima facie* case of purposeful discrimination by Chinnery. Although the People's counsel, after Chinnery attempted to strike both prospective Jurors No. 3 and No. 4, told the Superior Court that "I would want him to be careful that he's not trying to eliminate all the white people," (J.A. at 111), the mere fact that Chinnery had exercised two peremptory challenges on allegedly white jurors could not, in and of itself, establish a *prima facie* case. Notably, the Superior Court immediately recognized on the record that the People's statement constituted a *Batson* challenge[3] (J.A. at 111), but, rather than even considering — let alone balancing — the five *Simmons* factors, the Superior Court immediately moved to step

---

[3] The jury selection transcript indicates that, after counsel for the People stated "Your Honor, I would want him to be careful that he's not trying to eliminate all the white people," the Superior Court immediately stated "You either have a *Batson* challenge or you don't" and, after People's counsel stated that he was bringing a *Batson* challenge, the Superior Court directed the People to "[p]ut the reason on the record of the *Batson* challenge. . . ." (J.A. at 111.) However, after the People's counsel responded with "Your Honor, I would if, you know, the first two, I mean, indicated a Batson question as to —" the Superior Court interrupted the People, noted that "[s]he hasn't answered to anything, either three or four," and, after answering "Yes" to Chinnery's counsel's question as to whether "the challenge is because they're white," began to inquire from Chinnery's counsel as to the reasons for exercising peremptory challenges on prospective Jurors No. 3 and 4. (J.A. at 111-12.)

two of the *Batson* analysis and impermissibly shifted the burden of proof to Chinnery. *See, e.g., United States v. Martinez,* 621 F.3d 101, 109 (2d Cir. 2010) (explaining that burden only shifts from moving party to non-moving party in *Batson* inquiry if the moving party establishes a prima facie case); *Wilson v. Beard,* 426 F.3d 653, 668 (3d Cir. 2005) (holding that trial court proceeds to step two of *Batson* only once party bringing *Batson* challenged has satisfied step one).

▇▇▇ Likewise, the Superior Court continued to misapply *Batson* when it summarily rejected Chinnery's race neutral explanation that he wished to strike the jurors due to the way they were looking at the alleged victim and because of the jurors' social class.[4] (J.A. at 112-13.) "[T]he [United States] Supreme Court has purposely set a relatively low bar at step two. It therefore is rare for a case to be decided at this stage of the analysis. Indeed, '[t]he second step of [the *Batson* analysis] does not demand an explanation that is persuasive, or even plausible.' Rather, the sole issue at step two 'is the facial validity of the . . . explanation. Unless a discriminatory intent is inherent in the . . . explanation, the reason offered will be deemed race neutral.' " *Hardcastle v. Horne,* 368 F.3d 246, 257 (3d Cir. 2004) (quoting *Purkett v. Elem,* 514 U.S. 765, 767-68, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995)) (internal citation omitted). Significantly, courts have, in numerous other cases, consistently characterized the same explanations Chinnery gave for wanting to strike prospective Jurors No. 3 and No. 4 as race neutral. *See, e.g., United States v. Katuramu,* 174 Fed. Appx. 272, 275-76 (6th Cir. 2006) (holding juror's socioeconomic class constitutes race neutral reason under *Batson,* even if counsel never questioned jurors about their socioeconomic status during voir dire); *United States v. Smalls,* Nos. 92-5900, 93-5045, 93-5088, 93-5135, 1994 U.S. App. LEXIS 5129, *17 (4th Cir. 1994) (holding juror's economic status is race neutral); *United States v. Pofahl,* 990 F.2d 1456, 1466 (5th Cir. 1993) (same); *Rogers v. State,* 819 So. 2d 643, 649-50 (Ala. Crim. App. 2001) (holding way juror looked at defendant constituted race

---

[4] When asked to provide his reasons for exercising his peremptory challenges to strike prospective Jurors No. 3 and 4, Chinnery's counsel first said, "It's the way they been looking at the alleged victim here, the way they have been looking at my client, especially Number 4," and, after further inquiry, said "Three has been looking at me, I'm uncomfortable." (J.A. at 112.) After the Superior Court stated that "[t]here's not enough articulation" and told Chinnery's counsel that "something more articulable" was needed, Chinnery's counsel stated that "I think it's different social classes rather up there." (J.A. at 112-13.)

neutral explanation under *Batson*); *Jones v. State*, 787 So. 2d 154, 156 (Fla. Ct. App. 2001) (holding way juror was looking at defendant was facially neutral reason for exercising peremptory challenge of juror); *Pleasants v. Alliance Corp.*, 209 W. Va. 39, 543 S.E.2d 320, 325 (W.Va. 2000) (characterizing socioeconomic class and eye contact as facially neutral reasons for striking jurors under *Batson*); *Johnson v. State*, 959 S.W.2d 284, 291-92 (Tex. App. 1997) (holding socioeconomic background is specific and race neutral reason for striking prospective juror under step two of *Batson*). Accordingly, the Superior Court, even if it could have proceeded to step two of the *Batson* analysis, erred when it rejected Chinnery's race neutral explanation and, consequently, failed to apply step three.

### 3. *The Superior Court's Error Requires a New Trial as a Remedy*

 Finally, the People contend that, even if the Superior Court erred in its *Batson* analysis, this Court should hold that any error is harmless and does not require a new trial. Specifically, the People cite *Rivera v. Illinois*, 556 U.S. 148, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009), for the proposition that "[b]ecause peremptory challenges are within the States' province to grant or withhold, the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution." 129 S. Ct. at 1454. However, the United States Supreme Court in *Rivera* expressly held that "[s]tates are free to decide, as a matter of state law, that a trial court's mistaken denial of a peremptory challenge is reversible error *per se.*" *Id.* at 1456. Consequently, because the right to exercise peremptory challenges in Virgin Islands criminal prosecutions is conferred by a local Virgin Islands statute, *see* 5 V.I.C. § 3603(a)[5] this Court possesses no obligation to apply a harmless error analysis, but may hold that the erroneous deprivation of a peremptory challenge will automatically require a new trial as a remedy.[6]

---

[5] "In criminal actions the parties shall be entitled to peremptory challenges to the extent authorized by Rule 24(b) of the Federal Rules of Criminal Procedure." 5 V.I.C. § 3603(a).

[6] According to the dissent, "the Virgin Islands has not adopted laws or established jurisprudence independent of the Federal Rules of Criminal Procedure that govern peremptory challenges," and "[b]ecause the Virgin Islands legislature expressly adopted Rule 24(b) to govern peremptory challenges in criminal matters in Virgin Islands courts, applying a *per se* reversal rule would give Rule 24(b) a different meaning in our courts than it has been given by the United States Supreme Court." However, it has long been recognized in this jurisdiction that

██ Nevertheless, it is not necessary for this Court to determine at this time whether all violations of section 3603(a) are subject to *per se*

"where a Virgin Islands statute is patterned after a statute from another jurisdiction, the borrowed statute shall be construed to mean what the highest court from the borrowed statute's jurisdiction, *prior* to the Virgin Islands enactment, construed the statute to mean." *V.I. Gov't Hosp. and Health Facilities Corp. v. Gov't*, 47 V.I. 430, 442 (V.I. Super. Ct. 2006) (citing *Berkeley v. West Indies Enterprises, Inc.*, 10 V.I. 619, 625, 480 F.2d 1088, 1092 (3d Cir. 1973)) (emphasis in original); *Anthony v. Lettsome*, 22 V.I. 328, 329-30 (D.V.I. 1986).

Here, section 3603(a) — one of the original provisions of the Virgin Islands Code adopted with an effective date of September 1, 1957, *see* 1 V.I.C. § 3 — does reference Federal Rule of Criminal Procedure 24(b). Rule 24(b), however, "embodie[d] existing law," FED. R. CRIM. P. 24 advisory committee's notes (1944), that dates back as early as 1790. *United States v. Martinez-Salazar*, 528 U.S. 304, 311, 120 S. Ct. 774, 779, 145 L. Ed. 2d 792 (2000) (citing Act of Apr. 30, 1790, ch. 9, § 30, 1 Stat. 119). Prior to September 1, 1957, the United States Supreme Court had held that denying a defendant the right to exercise a peremptory challenge constitutes *per se* reversible error without a showing of prejudice. *See Harrison v. United States*, 163 U.S. 140, 141-42, 16 S. Ct. 961, 41 L. Ed. 104 (1896). Significantly, while the United States Supreme Court has very recently limited the scope of *Harrison* through *Martinez-Salazar* and *Rivera*, the Third Circuit continued to apply *Harrison's per se* reversal rule as binding precedent as late as 1995. *See Kirk v. Raymark Industries, Inc.*, 61 F.3d 147, 158 (3d Cir. 1995). Thus, under the rule established in *V.I. Gov't Hosp. and Health Facilities Corp.* and other cases, it would appear that section 3603(a) should be interpreted in light of federal case law interpreting Federal Rule of Criminal Procedure 24(b) at the time of the September 1, 1957 enactment of the statute, with any subsequent interpretations only representing persuasive, rather than binding, authority. *See also Van Cleef v. Aeroflex Corp.*, 657 F.2d 1094, 1098 (9th Cir. 1981) ("In Arizona, when a statute is adopted from another state, it is presumed that the statute is taken with the construction placed upon it by the courts of that state prior to its adoption."); *Zerbe v. State*, 583 P.2d 845, 846 (Alaska 1978) (explaining that Alaskan courts, in interpreting Alaska statute modeled after federal statute, only bound by decisions of United States Supreme Court and United States Court of Appeals for the Ninth Circuit interpreting that statute prior to its adoption by Alaska); *Whitt v. District of Columbia*, 413 A.2d 1301, 1303-04 (D.C. 1980) ("When one jurisdiction adopts in similar form a regulation of another, it is deemed to have adopted prior constructions of the regulation in the jurisdiction in which it originated; no similar presumption exists as to subsequent constructions in the originating jurisdiction.").

Given this Court's holding that the error in this case was not the result of a good faith misapplication of *Batson*, it is not necessary for this Court to determine, as part of this appeal, whether (1) *V.I. Gov't Hosp. and Health Facilities Corp.* and similar cases were incorrectly decided; or (2) if, notwithstanding the traditional rules of statutory construction, this Court should hold that the Legislature intended for Virgin Islands courts to apply new federal case law interpreting Federal Rule of Criminal Procedure 24(b) rather than contrary federal case law that was in effect at the time section 3603(a) was enacted. Rather, we merely wish to emphasize that the issue of whether violations of section 3603(a) are subject to *per se* reversal or may be reviewed for harmless error is not one that is easily resolved, and therefore should not be gratuitously reached as part of this appeal when narrower grounds for reversal exist. *See Murrell v. People*, 54 V.I. 338, 347-48 (V.I. 2010) (emphasizing need of appellate court to avoid reaching important issues needlessly).

reversal or are reviewable for harmless error because the error, in the instant case, is one that requires reversal under the standard set forth in *Rivera*. In *Rivera*, the United States Supreme Court emphasized that its decision that violations of state law regarding peremptory challenges could be reviewed for harmless error only applied to situations where the defendant's loss of a peremptory challenge was the result of "a state court's good-faith error." 129 S. Ct. at 1453. For instance, the *Rivera* court noted that, in that case, "the trial judge's conduct reflected a good-faith, if arguably overzealous, effort to enforce the antidiscrimination requirements of our *Batson*-related precedents," and that "there [wa]s no suggestion . . . that the trial judge repeatedly or deliberately misapplied the law or acted in an arbitrary or irrational matter."[7] *Id.* at 1455. Thus, the *Rivera* court concluded that "[t]o hold that a one-time, good-faith misapplication of *Batson* violates due process would likely discourage trial courts and prosecutors from policing a criminal defendant's discriminatory use of peremptory challenges." *Id.*

To date, only one court has fully analyzed what sort of error would not constitute a "good-faith misapplication of *Batson*" pursuant to *Rivera*, and would thus require reversal even if most *Batson* errors could be reviewed for harmless error. In *Pellegrino v. AMPCO System Parking*, 486 Mich. 330, 785 N.W.2d 45 (2010), the Michigan Supreme Court noted that the United States Supreme Court had "contrasted a judge's good-faith mistake with one arising because the judge deliberately misapplied the law or because the judge had acted in an arbitrary or irrational manner," which indicated that the latter situations would constitute the types of cases in which reversal would remain required by the United States Constitution. *Id.* at 57. *See also Bell v. Jackson*, 379 Fed. Appx. 440, 445 (6th Cir. 2010) (noting that "*Rivera* leaves open the possibility that a *Batson* error might require reversal as a matter of due process if the 'trial judge repeatedly or deliberately misapplie[s] the law or act[s] in an arbitrary or irrational manner.' ") (quoting *Rivera*, 129 S.Ct. at 1455). Applying this standard, the Michigan Supreme Court then proceeded to hold that a trial judge's *Batson* error required reversal because the record had indicated that the trial judge denied a peremptory challenge because

---

[7] We note that, in this case, there is no evidence that the Superior Court repeatedly or deliberately misapplied *Batson*. However, as discussed in the remainder of this section, the Superior Court's actions in this case constituted a total failure to apply *Batson*. Moreover, the Superior Court acted in an arbitrary and capricious manner when it allowed Chinnery to nevertheless choose to strike one of the prospective jurors despite sustaining the People's *Batson* challenge with respect to both jurors.

the judge did not want to "indulge in race baiting."[8] *Pellegrino*, 785 N.W.2d at 57 (internal quotation marks omitted).

 ■ We agree with the Michigan Supreme Court's interpretation of *Rivera* and conclude that, under this standard, the Superior Court's interference with Chinnery's exercise of his peremptory challenge requires reversal as a matter of due process. As a threshold matter, we note that, after being informed by Chinnery's counsel that he wanted to strike the prospective Jurors No. 3 and No. 4 due to their social class and because of how they were looking at him and the alleged victim, the Superior Court stated that it was denying Chinnery's peremptory challenge because "I don't do that."[9] (J.A. at 113.) This statement,

---

[8] As the dissent correctly notes, the behavior of the trial judge in *Pellegrino* is different from that of the Superior Court in the instant case, in that the *Pellegrino* judge outright stated that he would "seek to have this proportional representation on the juries that hear cases in this court" until he is "removed from the bench by the disciplinary committee." 785 N.W.2d at 49. However, there is nothing in the *Pellegrino* decision that would in any way indicate that the Michigan Supreme Court believed that the actions of the *Pellegrino* judge represented the minimum conduct required for reversal under *Rivera*. Notably, the fact that the *Pellegrino* court did not just order a new trial, but made the highly unusual decision to mandate that the new trial occur before a different judge, demonstrates that the actions of the *Pellegrino* judge far exceeded the minimum necessary for required reversal under *Rivera*.

[9] The full transcript of the pertinent exchange between Chinnery's counsel and the Superior Court reads as follows:

 ATTORNEY QUINN: It's the way they been looking at the alleged victim here, the way they been looking at my client, especially Number 4.

 THE COURT: How about three?

 ATTORNEY QUINN: The same thing. Three has been looking at me, I'm uncomfortable.

 THE COURT: Maybe she likes you.

 ATTORNEY QUINN: I don't think so. The vibe I'm getting, I'm pretty good at picking up.

 THE COURT: There's not enough articulation. It's either something specific, something specific.

 ATTORNEY QUINN: The People don't give you information either on the charge, when they come up, you have to go through —

 THE COURT: You need something more articulable. He has to state or show me something that in anyway show that it's for whatever reason, but saying the way they looking at the defendant.

 ATTORNEY QUINN: I think it's different social classes rather up here.

 THE COURT: No, I don't do that. I don't see — what particular strategy the others possessing? I don't see, what is it that — what do the others possess? Either you strike one, not both.

combined with the Superior Court's failure to perform a *Batson* analysis despite recognizing on the record that the People's challenge arose under *Batson*, (J.A. at 111), indicates that the Superior Court, like the judge in *Pellegrino*, denied Chinnery his right to exercise his peremptory challenges based on its own personal preferences rather than a good-faith attempt to follow *Batson*. Moreover, even if the Superior Court initially acted in good-faith — which we have no reason to doubt — its ultimate decision to nevertheless allow Chinnery to choose to strike one of the two prospective jurors — notwithstanding the fact that it had rejected Chinnery's race neutral explanation and upheld the People's *Batson* challenge with respect to *both* jurors — was inherently arbitrary and irrational.[10] Accordingly, we conclude that a new trial is warranted in this

---

(J.A. at 112-13.)

[10] The dissent, citing to *Black's Law Dictionary*, states that "[a] judicial decision is arbitrary when it is 'founded on prejudice or preference rather than on reason or fact,' " and would find that the Superior Court did not act arbitrarily because "the Superior Court expressed neither prejudice nor preference in applying *Batson*." First, we note that other courts and dictionaries have not adopted such a narrow definition of "arbitrary". *See, e.g., Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 63 (1st Cir. 1992) (defining "arbitrary" as "selected at random and without reason. . . .") (citing Webster's New Collegiate Dictionary); *Saccucci Auto Group, Inc. v. Am. Honda Motor Co., Inc.*, 2009 U.S. Dist. LEXIS 122015, *14 (D.R.I. 2009) (defining "arbitrary" as "[d]etermined by chance, whim, or impulse, and not by necessity, reason, or principle[,] or [are] [b]ased on or subject to individual judgment or preference . . . .") (citing The American Heritage Dictionary of the English Language 91 (4th ed. 2000). But even under the *Black's Law Dictionary* definition of that term, the Superior Court's statement to Chinnery's counsel that "I don't do that" is sufficient to hold that the Superior Court, at this point in the proceedings, had decided to apply its own personal preferences notwithstanding the law. *See Forensic v. Birkett*, 501 F.3d 469, 477-78 (6th Cir. 2007) (holding, in context of applying *Black's Law Dictionary* of "arbitrary," that judge's statement that "I'm not worried about that" and "I don't care what he says" required inference that judicial decision was arbitrary).

Moreover, as noted above, the *Pellegrino* and *Bell* decisions expressly state that reversal remains required under Rivera if a judge's actions were arbitrary or irrational. Notably, Black's Law Dictionary — the same authority relied upon by the dissent for the definition of arbitrary — defines "irrational" as simply "[n]ot guided by reason or by a fair consideration of the facts," without any requirement that the decision-maker prefer or be prejudiced against any particular party. *Black's Law Dictionary* 847 (8th ed. 2004). Importantly, although the dissent would hold that the Superior Court "made [its] decision guided by reason" because it "attempted to prevent . . . a discriminatory use of a peremptory challenge," it is not clear how this could have been the Superior Court's underlying motive, given that — if the Superior Court believed Chinnery's counsel was exercising his peremptory challenges in a discriminatory manner — this decision facilitated, rather than prevented, such discrimination. But even more significantly, the Superior Court could not have itself engaged in a fair

matter because the Superior Court's error rises to the level of a deprivation of due process that, pursuant to the United States Supreme Court's decision in *Rivera*, this Court remains obligated to reverse even if we retain the discretion to review "good-faith misapplication[s] of *Batson*" only for harmless error.

## C. Admission of Chinnery's Prior Bad Acts

 Given this Court's holding that Chinnery is entitled to a new trial due to the Superior Court's erroneous deprivation of his right to exercise a peremptory challenge on prospective Juror No. 3, it would ordinarily not be necessary for this Court to consider Chinnery's other arguments in favor of a new trial. "However, it is well established that an appellate court, when ordering a remand to a trial court for further proceedings based on its disposition of one issue may, in the interests of judicial economy, nevertheless consider other issues that, while no longer affecting the outcome of the instant appeal, are 'likely to recur on remand.' " *Smith v. Turnbull*, 54 V.I. 369, 374-75 (V.I. 2010) (quoting *Rivera-Flores v. Puerto Rico Telephone Co.*, 64 F.3d 742, 749 (1st Cir. 1995)). Consequently, while it is unnecessary for this Court to address Chinnery's request "for a new trial because the record demonstrates that there is a serious danger that a miscarriage of justice has occurred," (Appellant's Br. at 16 (internal citations and quotation marks omitted)),[11] this Court, in the interests of judicial economy, shall consider Chinnery's claim that the Superior Court erred when it granted the People's April 16,

---

consideration of the facts surrounding the two peremptory challenges, given that it delegated to Chinnery's counsel the ultimate decision of which prospective juror would be stricken and which would be permitted to sit on the jury.

[11] This Court notes that, although Chinnery moved for a judgment of acquittal in the Superior Court based on the same grounds, his appellate brief expressly states that he "does not seek from this Court an order of outright acquittal," but "only asks for a new trial" as a remedy because "the law does not permit Chinnery to seek outright acquittal" on the basis that the evidence introduced at trial presents "a serious danger that a miscarriage of justice has occurred." (Appellant's Br. at 16-17.) However, to the extent this Court should nevertheless construe Chinnery's challenge to the weight of the evidence as a challenge to the sufficiency of the evidence — which it does not — we cannot conclude that the evidence introduced at trial, when viewed in the light most favorable to the People, *see Latalladi v. People*, 51 V.I. 137, 145 (V.I. 2009), was insufficient to sustain both of Chinnery's convictions, given A.S.'s testimony that Chinnery touched her breast and buttocks, (J.A. at 176-77), Y.S.'s testimony that she saw Chinnery touch A.S.'s buttocks, (J.A. at 264), and Parsil's testimony that she saw Chinnery trying to feel both girls' chests. (J.A. at 343.)

2008 and April 18, 2008 motions to admit evidence of Chinnery's prior bad acts pursuant to Federal Rule of Evidence 404(b).

■ As a preliminary matter, this Court must consider the impact recent changes to the evidentiary rules have on the instant appeal. Ordinarily, "this Court applies on appeal the evidentiary rules that were in effect at the time [the defendant] was tried in the Superior Court," *Blyden*, 53 V.I. at 658. At the time of Chinnery's trial, "the 1953 version of the Uniform Rules of Evidence ('URE'), codified as 5 V.I.C. §§ 771-956, appl[ied] to evidentiary issues in local Virgin Islands Courts," and thus the parties' and the Superior Court's reliance on Federal Rule of Evidence 404 to the exclusion of the URE constituted error, *id.* at 658 n.15 (citing *Phillips v. People*, 51 V.I. 258, 273 (V.I. 2009)), albeit a harmless one because the pertinent provisions were almost identical. *See Mulley v. People*, 51 V.I. 404, 411 (V.I. 2009) ("[S]ince the pertinent clause of the federal rule contains virtually the same language as section 885, reliance on Federal Rule of Evidence 403 in this case is harmless.").

■ However, "on March 26, 2010 the Legislature approved, and on April 7, 2010 the Governor signed into law, Act No. 7161, section 15 of which repealed the local URE" and replaced it with the Federal Rules of Evidence. *Id.* at 658 n.15. Thus, while both the Superior Court and the parties erred in applying Federal Rule of Evidence 404 to the People's motion at the time the motion was made, the Federal Rules of Evidence will apply to Chinnery's new trial on remand. Under these unique circumstances, this Court, in the interests of judicial economy, shall analyze the People's motion under the legal standard considered by the Superior Court, which is the same standard that will govern on remand. *See United States v. Duke*, 50 F.3d 571, 575 (8th Cir. 1995) (explaining that appellate court may, on a "case-by-case" basis, retroactively apply a new procedural rule when it is "just and practicable").

■ Federal Rule of Evidence 404 provides, in pertinent part, that

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. *It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident*, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial no-

tice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

FED. R. EVID. 404(b) (emphasis added). "To satisfy Rule 404(b), evidence of other acts must (1) have a proper evidentiary purpose, (2) be relevant under Rule 402, (3) satisfy Rule 403 (i.e., not be substantially more prejudicial than probative), and (4) be accompanied by a limiting instruction, when requested pursuant to Federal Rule of Evidence 105, that instructs the jury not to use the evidence for an improper purpose." *United States v. Cross*, 308 F.3d 308, 320-21 (3d Cir. 2002). " 'Other acts' evidence satisfies the first two requirements if it is 'probative of a material issue other than character.' " *Id.* (quoting *Huddleston v. United States*, 485 U.S. 681, 685, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988)).

The People, through their motion, sought to admit Chinnery's prior statements that he was going to marry A.S., that A.S. had a "nice ass," and his inquiry into whether A.S. was a virgin. In his appellate brief, Chinnery contends that the Superior Court erred when it allowed A.S. and her mother to testify about his prior statements to them because (1) the Superior Court did not explain its grounds for overruling Chinnery's objection that the statements were more prejudicial than probative under Rule 403; and (2) the evidence should have been excluded because the statements "are much too attenuated and remote from the chance meeting [Chinnery] had with [A.S.] and [Y.S.] on the street . . . on January 18, 2008." (Appellant's Br. at 15.) We disagree.

 Although the Superior Court did not expressly perform a Rule 403 balancing test on the record, its oral ruling at the February 11, 2009 pre-trial conference clearly indicated that it overruled Chinnery's objection because it agreed with the People's contention that the statements were highly probative of Chinnery's intent and state of mind. *See Mulley*, 51 V.I. at 411; *see also United States v. Garner*, 281 Fed. Appx. 571, 575 (7th Cir. 2008) ("[A]ll probative evidence is prejudicial to a criminal defendant; . . . to warrant exclusion . . . its probative value must be slight in comparison to its inflammatory nature.") (citing *United States v. Gougis*, 432 F.3d 735, 743 (7th Cir. 2005)). Moreover, we agree with the Superior Court that, although the statements the People sought to admit were allegedly made a year or more before the charged conduct, the statements were necessary both to respond to Chinnery's defense that his contact with A.S. was not sexual and to "complete[] the story of the

crime" as well as to "explain[] the relationship of the parties or the circumstances surrounding a particular event," *United States v. Rock*, 282 F.3d 548, 551 (8th Cir. 2002). Significantly, we reject Chinnery's claim that "[t]he evidence could only be taken by the jury as an indication of Chinnery's bad character," (Appellant's Br. at 15), because the statements the People introduced at trial all related to Chinnery's particular interest in A.S., and were not evidence that Chinnery possessed a general sexual interest in children. Therefore, we find that the Superior Court did not abuse its discretion when it admitted evidence of Chinnery's prior acts pursuant to Federal Rule of Evidence 404(b).

## III. CONCLUSION

Because the *Batson* challenge in this case was brought by the People and Chinnery did not accept the Superior Court's decision to sustain the *Batson* challenge, we find that Chinnery fully preserved the *Batson* issue for appeal. Moreover, since the Superior Court did not make a good-faith attempt to comply with *Batson*, but acted in an arbitrary and irrational manner, we conclude that Chinnery is entitled to a new trial. The Superior Court did not err when it granted the People's motion to admit evidence of his prior statements to and about A.S. Therefore, the Superior Court's admission of Chinnery's prior statements about A.S. was not error.

CABRET, *Justice, concurring in part, dissenting in part.* I concur with the majority's conclusion that the Superior Court did not err in its admission of Chinnery's prior bad acts. Likewise, I concur with the conclusion that the Superior Court erred in its *Batson* analysis. I dissent, however, from the conclusion that such an error must be remedied by a new trial. The central question left open by *Rivera v. Illinois*, 556 U.S. 148, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009), is whether, under Virgin Islands law, a trial court's good faith misapplication of *Batson* should be subject to harmless error review, or if such an error requires automatic reversal. The majority opinion does not decide this issue, and instead finds that the Superior Court's error was not in good faith. For the reasons that follow, I dissent from the conclusion that the Superior Court judge did not act in good faith and would hold the Superior Court's *Batson* error harmless.

### 1. Good Faith Error

To support the conclusion that the Superior Court did not commit a good faith error, the majority relies on a recent decision of the Michigan

Supreme Court, *Pellegrino v. AMPCO Sys. Parking*, 486 Mich. 330, 785 N.W.2d 45 (Mich. 2010), which held that *Rivera* is not applicable in a situation where the trial judge "deliberately misapplied" *Batson* or otherwise "acted in an arbitrary or irrational manner." *Id.* at 57. In *Pellegrino*, the defendant sought to exercise a peremptory challenge by removing an African-American woman from the panel. The plaintiff challenged this removal under *Batson*. The defense stated that the motivation behind the challenge was that the prospective juror was twice widowed, and still grieving the recent loss of her mother. *Id.* at 48. The trial judge seated the juror, later characterized the defense's peremptory challenge as race-baiting, and stated:

> I guess I'm [in] sufficient hot water with the appellate courts to say I'm not going to . . . indulge in . . . race baiting . . . . Now if the Supreme Court rules that way, I suspect they would not but if they do, then I'll have to decide whether I can function as a judge any longer.
>
> . . .
>
> I am until either removed from the bench by the disciplinary committee or ordered to have a new trial, I am going to seek to have this proportional representation on the juries that hear cases in this court. I can't be clearer. I'm going to do it until I'm ordered not to do it and then when I'm ordered not to do it, then I'll have to decide what's next for me.

*Id.* at 49.

The Michigan Supreme Court found that these comments, which indicated that the trial judge "would continue to apply his own personal view of the law, rather than the law of this state," along with the rulings made at trial, were sufficient to "establish a basis for concluding that this is the unusual case in which retrial should occur before a different judge." *Id.* at 57-58.

The behavior of the *Pellegrino* trial judge is very different from that displayed in *Rivera* and the present case. In both *Rivera* and the present case, the trial judge did not allow the defendant to strike a potential juror based on an incomplete *Batson* analysis. *See Rivera*, 556 U.S. at 153, 129 S. Ct. at 1451 (stating that the trial judge brought counsel to chambers "[w]ithout specifying the type of discrimination he suspected or the

reasons for his concern," rejected the defendant's race-neutral justifications for the strike, and seated the challenged juror). In the present case, the Superior Court judge did not express any unwillingness to comply with the law, or place a personal view above the law of the Virgin Islands. Instead, the trial judge clearly sought to apply the holding in *Batson*, if not the actual test described therein.[1] Because the (J.A. 111-13.) record provides no information about the make-up of the panel of potential jurors or the jury as seated, we cannot evaluate the propriety of the *Batson* challenge itself. *See Batson v. Kentucky*, 476 U.S. 79, 96-97, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) (describing what kind of information is relevant to evaluating a Batson challenge). But what is clear on the record is that the Superior Court, by denying one of the challenged strikes, felt that there was some merit to the challenge and

---

[1] The entirety of the *Batson* discussion during voir dire was as follows:

> Attorney Dick: Your Honor, I would want him to be careful that he's not trying to eliminate all the white people.
>
> The Court: You either have a Batson challenge or you don't.
>
> Attorney Dick: Well, I believe it's a Batson.
>
> The Court: Put the reason on the record of the Batson challenge or you're not.
>
> Attorney Dick: Your Honor, I would, if you know, the first two, I mean, indicated a Batson question as to —
>
> The Court: What's the reason he's giving a Batson challenge? She hasn't answered to anything, either three or four.
>
> Attorney Quinn: What is he saying, that the challenge is because they're white?
>
> The Court: Yes.
>
> Attorney Quinn: It's the way they been looking at the alleged victim here, the way they been looking at my client, especially Number 4.
>
> The Court: How about three?
>
> Attorney Quinn: The same thing. Three has been looking at me, I'm uncomfortable. . . .
>
> The Court: There's not enough articulation. It's either something specific, something specific.
>
> Attorney Quinn: The People don't give you information either on the charge, when they come up, you have to go through —
>
> The Court: You need something more articulable. He has to state or show me something that in anyway show that it's for whatever reason, but saying the way they [are] looking at the defendant.
>
> Attorney Quinn: I think it's different social classes rather up here.
>
> The Court: No, I don't do that. I don't see — what particular strategy the others possessing? I don't see, what is it that — what do the others possess? Either you strike one, not both.
>
> Attorney Quinn: If I have to leave one in, I will leave Number 3 in.

thought that the justifications provided (the way a juror looked at counsel, the defendant, the alleged victim and the difference in their social classes) were pretextual. *See Holloway v. Horn*, 355 F.3d 707, 728 (3d Cir. 2004) (stating that "[t]he *Batson* standard . . . is fluid, mainly because it places great confidence in the ability of trial judges to assess whether discrimination is at work based on the evidence at hand. The judge's assessment largely will turn on evaluation of credibility.") (internal quotation marks omitted).

The majority concedes in the present case that the Superior Court was initially acting in good faith, but the final decision-allowing only one of the two challenged jurors to be struck-was arbitrary and irrational. A judicial decision is arbitrary when it is "founded on prejudice or preference rather than on reason or fact." *Black's Law Dictionary* 119 (9th ed. 2009). Unlike the *Pellegrino* judge, the Superior Court expressed neither prejudice nor preference in applying *Batson*. A good faith error is an error made while maintaining "faithfulness to one's duty or obligation." *Id.* at 762. By assessing the credibility of Chinnery's justifications to strike the jurors, and determining that those justifications were pretextual, the Superior Court recognized that its duty was to prevent peremptory challenges from being exercised in an impermissibly discriminatory manner and sought a result consistent with that duty.

Similarly, an irrational judicial decision is one that is "[n]ot guided by reason or by a fair consideration of the facts." *Black's Law Dictionary* 906 (9th Ed. 2009). The majority contends that the rejection of the race-neutral explanation as to one juror, but not as to the other, was inherently irrational. That contention, however, ignores the purpose behind the *Batson* challenges. The judge made her decision guided by reason-she attempted to prevent what she clearly felt was a discriminatory use of a peremptory challenge. The fact that she made a mistake, and should have denied the justification as pretextual as against both jurors, does not make her actions irrational. As the *Rivera* Court held, where "there is no suggestion . . . that the trial judge repeatedly or deliberately misapplied the law or acted in an arbitrary or irrational manner" and instead erred while attempting to follow the requirements of the law, such actions "reflect[] a good-faith . . . effort to enforce [*Batson's*] antidiscrimination requirements." *Rivera*, 556 U.S. at 160, 129 S.Ct. at 1455. Therefore, the Superior Court's error was made in good faith and founded on *Batson* principles.

## 2. The Harmless Error Standard for a Batson Violation

There are two recognized standards for the remedy of a *Batson* violation — courts either apply the normal harmless error standard or a *per se* reversal rule, also known as a presumption of prejudice rule. The majority avoids reaching this question by holding that the Superior Court did not commit a good faith error, and therefore fails to trigger any harmless error standard. However, because I disagree with that holding, I am compelled to review Virgin Islands law to determine if there is a codified standard, and if not, which standard should otherwise be used.

Under Virgin Islands law, defendants are entitled to ten peremptory challenges in a felony case. 5 V.I.C. § 3603; FED. R. CRIM. P. 24(b)(2). Chinnery was given the opportunity to exercise ten challenges during jury selection and he exercised all ten. (J.A. 111-15.) The Virgin Islands Code does not explicitly provide a remedy for a defendant who, while exercising his full complement of peremptory challenges, was wrongly prevented from striking an otherwise qualified juror.

I turn, then, first to the *per se* reversal standard. The *per se*/presumption of prejudice standard traces its origins to *Swain v. Alabama* — a case which held that peremptory challenges were "challenges without cause, without explanation and without judicial scrutiny . . . [providing] justification for striking any group of otherwise qualified jurors in any given case, whether they be Negroes, Catholics, accountants or those with blue eyes." *Swain*, 380 U.S. at 212. *Batson* clearly overturned this unfettered use of peremptory challenges, but the presumption that prejudice is suffered any time a court interferes with the exercise of the challenges, until recently, lived on. The *Swain* Court stated "[t]he denial or impairment of the right [to exercise peremptory challenges] is reversible error without a showing of prejudice." *Id.* at 219. Subsequent Supreme Court cases that cast doubt upon the *per se* reversal rule and its presumption of prejudice have targeted courts' continued usage of this quotation and the principle it represents. *See United States v. Martinez-Salazar*, 528 U.S. 304, 317 n.4, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000) (stating "[w]e note, however, that this oft-quoted language in *Swain* was not only unnecessary to the decision in the case . . . but was founded on a series of our early cases decided long before the adoption of harmless-error review."); *see also Rivera*, 556 U.S. at 160, 129 S.Ct. at 1455 (stating that the *Swain* quotation was "disavowed"); *Commonwealth v.*

*Hampton*, 457 Mass. 152, 928 N.E.2d 917, 927 n.10 (2010) (recognizing that the *Swain* language upon which Massachusetts courts had based the *per se* reversal rule had been disavowed).

On the other hand, both prior to and following *Rivera* and *Martinez-Salazar*, several states have applied harmless error review. *See, e.g., Bethea v. Springhill Mem. Hosp.*, 833 So. 2d 1, 6 (Ala. 2002); *State v. Banks*, 278 Neb. 342, 771 N.W.2d 75, 88 (2009); *State v Johnson*, 229 P.3d at 534; *Green v. Maynard*, 349 S.C. 535, 564 S.E.2d 83, 85 (2002); *State v. Fire*, 145 Wn.2d 152, 34 P.3d 1218, 1225 (2001). For example, the Wisconsin Supreme Court overturned its previous precedent in light of *Martinez-Salazar. See State v. Lindell*, 245 Wis. 2d 689, 629 N.W.2d 223, 243-52 (2001); *see also State v. Hickman*, 205 Ariz. 192, 68 P.3d 418, 422 (2003) (overturning Arizona's automatic reversal rule in favor of harmless error review). Wisconsin had applied an automatic reversal rule, but the Court recognized that automatic reversal "requires a new trial in cases where the trial was nearly perfect and the verdict is unquestionably sound." *Lindell*, 629 N.W.2d at 249. In its decision, the *Lindell* Court noted that there is no clear majority in its fellow states for or against requiring a showing that a biased juror was seated before calling for reversal. *Id.* at 246, n.14 (collecting cases). Ultimately, the *Lindell* Court determined that the appropriate analysis should follow Wisconsin's harmless error statute by determining first whether or not the trial court erred, then, if an error is found, determining whether or not the error affected any substantial rights of the party. *Id.* at 250.

States that continue to apply a *per se* reversal rule following *Rivera* have done so based on their own jurisprudence, developed independently of the federal holdings. *See Commonwealth v. Hampton*, 457 Mass. 152, 928 N.E.2d 917, 926-27 (2010); *State v. Campbell*, 772 N.W.2d 858, 862 (Minn. Ct. App. 2009); *People v. Hecker*, 15 N.Y.3d 625, 942 N.E. 2d 248, 272, 917 N.Y.S.2d 39 (2010) (finding that although peremptory challenges were not "a trial tool of constitutional magnitude," they were nevertheless protected under New York's criminal procedure laws). As discussed previously, Michigan has considered, and declined to follow, *Rivera* based on factual distinctions. *Pellegrino*, 785 N.W.2d at 57.

As neither the Virgin Islands Legislature nor the courts of the Virgin Islands have developed rules or jurisprudence independent of the federal holdings interpreting *Batson*, this Court is free to apply the United States Supreme Court's reasoning, as expressed in *Rivera* and *Martinez-Salazar*,

that where "there is no suggestion . . . that the trial judge repeatedly or deliberately misapplied the law or acted in an arbitrary or irrational manner [and] the trial judge's conduct reflected a good-faith, if arguably overzealous, effort to enforce the antidiscrimination requirements of our *Batson*-related precedents," harmless error review is appropriate. *Rivera*, 556 U.S. at 160, 129 S. Ct. at 1455. Therefore, in light of the Supreme Court's guidance, I believe that the normal harmless error review is the appropriate standard.

In the instant case, there is no suggestion that the Superior Court deliberately or repeatedly misapplied the law. The record reflects that the trial court was aware of *Batson*'s requirements and sought to insure a jury selected in a non-discriminatory fashion. That the trial judge ultimately required Chinnery's counsel to select one of the two challenged jurors was not deliberately arbitrary, as it was done with the clear, if overzealous, purpose of attempting to comply with *Batson*. The Superior Court's good-faith error, then, should be subjected to harmless error review.

Such a result would also provide an interpretation of 5 V.I.C. § 3603 that is consistent with the Supreme Court's interpretation of Rule 24(b) of the Federal Rules of Criminal Procedure. Section 3603(a) of title 5 of the Virgin Islands Code states "[i]n criminal actions the parties shall be entitled to peremptory challenges to the extent authorized by Rule 24(b) of the Federal Rules of Criminal Procedure." The United States Supreme Court held that harmless error review is appropriate for violations of Rule 24(b). *Rivera*, 556 U.S. at 160, 129 S.Ct. at 1455; *Martinez-Salazar*, 528 U.S. at 317 n.4. This Court has adopted the harmless error test present in Rule 52 of the Federal Rules of Criminal Procedure. *See, e.g., Francis v. People*, 54 V.I. 313, 322 (V.I. 2010); *Blyden v. People*, 53 V.I. 637, 656-57 (V.I. 2010), *aff'd*, No. 10-3656, 437 Fed. Appx. 127, 2011 U.S. App. LEXIS 7969 (3d Cir. Apr. 19, 2011); *Phillips v. People*, 51 V.I. 258, 278-79 (V.I. 2009). Because the Virgin Islands legislature expressly adopted Rule 24(b) to govern peremptory challenges in criminal matters in Virgin Islands courts, applying a *per se* reversal rule would give Rule 24(b) a different meaning in our courts than it has been given by the United States Supreme Court. *See, e.g., Faulk v. State's Attorney for Harford Cnty.*, 299 Md. 493, 474 A.2d 880, 887 (1984) (stating "[w]here the purpose and language of a federal statute are substantially the same as that of a later state statute, interpretations of the federal statute are

ordinarily persuasive."); *Kortum v. Johnson*, 2008 ND 154, 755 N.W.2d 432, 441 (2008) (stating "[w]hen our statute is derived from and substantially identical to a statute from another state, the judicial decisions interpreting the foreign statute are highly persuasive.") (internal quotation marks omitted).

Furthermore, unlike Massachusetts, Minnesota, or New York, the Virgin Islands has not adopted laws or established jurisprudence independent of the Federal Rules of Criminal Procedure that govern peremptory challenges. The Virgin Islands Code provision addressing preemptory challenges in criminal matters does more than merely borrow language from the federal rule; it wholly adopts, by specific reference, the federal rule. Defendants in the courts of the Virgin Islands are only entitled to the peremptory challenges to the extent authorized by Rule 24(b), and Rule 24(b) does not authorize *per se* reversal. Therefore, a *per se* reversal rule, inconsistent with the United States Supreme Court's interpretation of Rule 24(b), is not appropriate for a trial court's good faith misapplication of *Batson*.

In applying harmless error review, we must determine whether an error "affect[s] substantial rights," and if there is no such effect, then the error "must be disregarded." FED. R. CRIM. P. 52(a). The Sixth Amendment guarantees that "the accused shall enjoy the right to a speedy and public trial, by an impartial jury." The Fourteenth Amendment Due Process Clause provides that no State may "deprive any person of life, liberty, or property, without due process of law." Finally, title 5 section 3603 provides that Chinnery is "entitled to peremptory challenges to the extent authorized by Rule 24(b) of the Federal Rules of Criminal Procedure."

Chinnery does not dispute that he received his trial by an impartial jury, and the United States Supreme Court has determined that preemptory challenges "are not of a federal constitutional dimension." *Martinez-Salazar*, 528 U.S. at 311 (distinguishing between the right to an impartial jury and the right to the preemptory challenge, which the Court labels "auxiliary"). As in *Rivera*, the erroneous denial of Chinnery's peremptory challenge impacted neither his Sixth Amendment fair trial right, nor his Fourteenth Amendment Due Process rights. *Rivera*, 556 U.S. at 159, 129 S.Ct. at 1454. Likewise, *Martinez-Salazar* made clear that Rule 24(b) does not authorize *per se* reversal. *Martinez-Salazar*, 528 U.S. at 317. As no substantial right was affected by the Superior Court's

error, it must, under Rule 52 of the Federal Rules of Criminal Procedure, be disregarded,

### 3. Conclusion

Because I conclude that the Superior Court made a good faith error in applying *Batson* to Chinnery's peremptory challenge, and that such error should be subjected to harmless error review, I cannot join with the majority's opinion, and respectfully dissent. I would find that the Superior Court's *Batson* error did not affect any of Chinnery's substantial rights, and that therefore the error must be disregarded and the judgment of the Superior Court affirmed.